CASE NUMBER 15-0404-DSC

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA
_____

*GARTH AND DEBORAH LANSAW,*

Appellees,

vs.

*FRANK ZOKAITES,*

Appellant.
_____

Appeal by Frank Zokaites from the Order of Court by the
Honorable Thomas P. Agresti, Judge, of the United States Bankruptcy Court
for the Western District of Pennsylvania, Dated January 14, 2015
Entering Judgment in Favor of Garth and Deborah Lansaw
and Against Frank Zokaites in the Amount of $50,100.
_____

**BRIEF FOR THE APPELLANT, FRANK ZOKAITES**
_____

Jeffrey A. Hulton, Esquire
Pa. ID No, 49522

429 Fourth Avenue, Suite 1201
Pittsburgh, Pa 15219
(412) 586-5592
jhulton@hultonlaw.com

Corporate Disclosure Statement Required Per
Federal Rule Bankruptcy Procedure 8012:

Undersigned counsel for Appellant, Frank Zokaites, in the above captioned action, certifies that there are no parents, subsidiaries and/or affiliates of said party that have issued shares or debt securities to the public.

Dated: June 30, 2015    /s/ Jeffrey A. Hulton, Esquire
           Jeffrey A. Hulton, Esquire
           Pa. ID No, 49522

           429 Fourth Avenue, Suite 1201
           Pittsburgh, Pa 15219
           (412) 586-5592
           jhulton@hultonlaw.com

**Table of Contents:**

**Page No:**

I.  Jurisdictional Statements…………………………………………………… .1

    A.    Basis for Bankruptcy Court's Subject Matter Jurisdiction……………...1
    B.    Basis for the District Court Jurisdiction………………………………...1
    C.    Filing Dates Establishing the Timeliness of the Appeal………………...1
    D.    The Appeal is from a Final Order/Judgment……………………………1

II.  Issues Presented for Review……………………………………………….2

    A.    <u>Res Judicata.</u>  The Lansaws filed a complaint for injunctive relief and for damages in 2006 in which, among other things, they raised claims of Zokaites having violated the automatic stay. The Honorable Judith K. Fitzgerald held a two day trial in 2006 on Lansaws' complaint, granted the injunction, allowed the Lansaws to terminate the Zokaites lease, but did not grant damages on the alleged stay violations, and then closed the adversary proceeding…………………………………………….2

        1.    The first issue is that Judge Agresti erred as a matter of law and fact in denying Zokaites' Motion to Amend Response to Debtor's Objection to Claim raising the legal principle of *res judicata* in that Judge Fitzgerald's refusal to award monetary damages after the full two day trial acted as *res judicata* for any further proceeding including the proceedings before Judge Agresti in August, 2014 that he formed a new case on his own accord…………………………………………………………………..2

        2.    The second issue is that Judge Agresti's playing a short audio recording that was not an order of court of any sort of Judge Fitzgerald to support his denial of Zokaites' Motion was taken out of context……………………………………………………………………2

    B.    <u>Damages for Emotional Distress.</u> Judge Agresti awarded Lansaws damages for their claimed emotional distress………………………..2

        1.    It was error to award Lansaws any emotional distress damages in the absence of any expert medical testimony or other credible evidence………………………………………………………………..2

i

2.      It was error to not require Lansaws to introduce any evidence to establish causation between their claimed emotional distress and the actions of Zokaites……………………………………………………2

3.      The damage award was improper because it was entirely speculative…………………………………………………………………..2

C.      Judge Agresti awarded Lansaws Punitive Damages…………………3

1.      The first issue is that such an award was unnecessary as a deterrence to Zokaites since Judge Fitzgerald lifted the injunction against him more than nine years prior to the 2015 award…………………………..3

2.      The second issue is that Judge Agresti erred in awarding punitive damages when the Lansaws failed to introduce any evidence of the financial wherewithal of Zokaites and whether he could afford and pay or not pay for such an award. In addition, Judge Agresti erred in himself researching and extracting or inferring such evidence of Zokaites' financial wherewithal and whether such inferences were entirely speculative and erroneous because he relied on nine year old general background testimony……………………………………………………..3

3.      The third issue is that Judge Agresti erred in relying on the factors he did in awarding punitive damages…………………………………3

4.      The fourth issue is that Judge Agresti improperly allowed prior testimony of attorney Donald Calaiaro and  he used such testimony to support his conclusion as to one of the factors for punitive damages……….3

D.      Judge Agresti erred in denying Zokaites' Offer of Judgment when the Lansaws received an award of zero on their false light claim compared to Zokaites' offer of judgment of $25,000…………………………3

E.      To the extent it was appropriate to award Lansaws any damages, Judge Agresti erred as a matter of law in failing to rule that any award for Lansaws constituted property of the estate………………………...3

Standards of Review………………………………………………………….3

III.   Statement of the Case………………………………………………………5

   A.   Nature of the Case, Procedural History and Factual Background……….5
   B.   Rulings Presented for Review…………………………………………...5

IV.   Summary of the Argument……………………………………………………6

   A.   <u>Res Judicata</u>. Lansaws filed a Complaint for Injunctive Relief that included a request for damages. Following a full two day trial in 2006, Judge Fitzgerald granted the request for injunctive relief and also granted Lansaws request to terminate the Zokaites lease. Notably, Judge Fitzgerald did not award Lansaws any monetary damages. Zokaites filed a Motion to Amend his Answer to Lansaws' Objection in which they re-asserted their claim for damages. Judge Agresti improperly denied this Motion, opened a new adversary on his own accord, and in an attempt to support his denial, played an audio tape of Judge Fitzgerald that was taken out of context…………………………………………………………………………..6

   B.   <u>Emotional Distress Damages</u>. The law is unsettled in the area of determining what evidence is required to support a claim for emotional distress. Nevertheless, Lansaws claim the continue to have emotional distress nine years after the stay violations. They introduced no medical bills and brought in no doctor to support their claim which was substantial error. Similarly deficient was Lansaws' failure to introduce any evidence of causation. Finally, Judge Agresti's award was not based on the record but entirely speculative……………………………………………………….6

   C.   <u>Punitive Damages</u>. Judge Agresti's award of punitive damages was unnecessary as a deterrence to Zokaites since Judge Fitzgerald lifted the injunction lodged against him nine years ago and there has been no incidents since. Further, Judge Agresti used general background testimony from nine years ago to try to meet the required factor of the financial wherewithal of the defendant. Finally, Judge Agresti improperly allowed the testimony of Lansaws' former attorney to support the award of punitive damages………………………………………………………………..6

   D.   <u>Offer of Judgment.</u>  Judge Agresti improperly denied Zokaites' Offer of Judgment that was comprised of two separate offers, one for the claim of false light and the second for the stay violations. The offer of judgment should have been accepted because Zokaites' offer on the false light exceeded the amount of the award to Lansaws which was zero………………………………………………………………………....7

E.     <u>Property of the Estate</u>.  To the extent an award should be made in favor of the Lansaws, Judge Agresti failed to address at all that the award constitutes property of the estate……………………………………………..7

V.     Argument……………………………………………………………………..8

VI.    Conclusion………………………………………………………………...66

VII.   Certification……………………………………………………………69

VIII.  Request for Oral Argument……………………………………………70

**Table of Authorities:**

**Page No.**

Cases:

*Aiello v. Providian Financial Corp.*, 239 F.3d 876
    (7th Cir. 2001)……………………………………..19, 20, 24, 25, 29, 36, 40, 49
*Alston v. King*, 231 F.3d 383 (7th Cir. 2000)……………………………………………21
*BMW of North America v. Gore*, 517 U.S. 559 (1996)…………………………………55
*Carey v. Piphus*, 435 U.S. 247 (1978)……………………………………………30, 31
*CGB Occupational Therapy, Inc. v. RHA Health*
    *Services, Inc.*, 499 F.3d 184 (3d Cir. 2007)………………………………54, 55
*Coalition to Save Our Children v. Board of Educ.*, 90 F.3d 752 (3d Cir. 1972)…………4
*Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532 (1994)…………………………………21
*Continental Tred Resources v. Oxy USA Inc.*, 101 F.3d 634 (1996)……………………56
*Dawson v. Washington Mutual Bank*, 390 F.3d 1139
    (9th Cir. 2004)………………………………………21-23, 26-29, 31, 35, 37, 66
*Dean v. Carr*, 2012 WL 4634291 (Bankr. M.D. Pa. 2012)………………………………38
*DiFederico v. Rolm Co.*, 201 F.3d 200 (3d Cir. 2000)………………………………...3, 4
*Fleet Mortg, Group, Inc. v. Kaneb*, 196 F.3d 265 (1st Cir. 1999)………………………40
*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)………………………………………31
*In re Bishop*, 296 B.R. 890 (Bankr. S.D. Ga. 2003)………………………………………46
*In re GGSI Liquidation, Inc.*, 351 B.R. 529 (Bankr. N.D. Ill 2006)……………………51
*In re Iskric*, 496 B.R. 355 (Bankr. M.D. Pa. 2013)……………………………40, 49
*In re Jackson*, 309 B.R. 33 (Bankr. W.D. Mo. 2004)…………………………………...28
*In re Livingston & Co., Inc.*, 186 B.R. 841 (D.N.J. 1995)……………………………...3, 4
*In re Nixon*, 419 B.R. 281 (Bankr. E.D. Pa. 2009)………………………………………49
*In re Radcliffe*, 372 B.R. 401 (Bankr. N.D. Ind. 2007)…………………………………51
*In re Repine*, 536 F.3d 512 (5th Cir. 2008)………………………………………………23
*In re Shade*, 261 B.R. 213 (Bankr. S.D. Ill 2001)……………………………………27, 50
*In re Skeen*, 248 B.R. 312 (E.D. Tenn 2000)……………………………………………37
*In re Smith*, 170 B.R. 111 (Bankr. N.D. Ohio 1994)……………………………………51
*In re Wingard*, 382 B.R. 892 (Bankr. W.D. Pa. 2008)………………………25, 35, 37, 40
*Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988 (1987)……………………32
*Mathias Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003)…………………57
*Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424 (1997)……………….21
*Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991)…………………………………52
*Purter v. Heckler*, 771 F.2d 682 (3d Cir. 1985)…………………………………………13
*Spence v. Board of Education*, 806 F.2d 1198 (3d Cir. 1986)…………………30, 31, 39
*State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408 (2003)…………………………55-58
*United States v. Athlone Industries, Inc.*, 746 F.2d 977 (3d Cir. 1984)…………………12
*United States v. Harchar*, 331 B.R. 720 (N.D. Ohio 2005)…………………………...25
*Wecht v. PG Publishing Co.*, 725 A.2d 788 (Pa. Super. 1999)………………………...32, 39

v

Statutes-Federal:

11 U.S.C. § 362…………………………………………………..21, 24, 26, 49
11 U.S.C. § 541……………………………………………………….64, 65
11 U.S.C. § 553………………………………………………………….64
11 U.S.C. §727…………………………………………………………..65
11 U.S.C. § 1115………………………………………………………..65
11 U.S.C. § 1306……………………………………………………….65
28 U.S.C. § 157…………………………………………………………..1
28 U.S.C. § 1334………………………………………………………….1

Rules-Federal:

Fed. R. Civ. P. 68……………………………………………………60-64
Fed. R. Bank. P. 7068………………………………………………...60
Fed. R. Bank. P. 8015………………………………………………..69
Fed R. Bank. P. 8016………………………………………………...69
Fed. R. Bank. P. 8019………………………………………………..69

Treaties:

*Restatement (Second) of Torts* § 46…………………………………………21
*Restatement (Second) of Torts* § 652E……………………………………32, 40
W. Page et al., Prosser & Keeton on the law of Torts,
 §54, pp. 361-65 (5th ed. 1984)……………………………………21
Archibald H. Throckmorton, "Damages for Fright," 34
 Harv. L. Rev. 260 (1921)……………………………………………21

# I. Jurisdictional Statements:

## A. Basis for the Bankruptcy Court's Subject Matter Jurisdiction.

The Bankruptcy Court originally had jurisdiction over these matters pursuant to 28 U.S.C. §§ 157(a) and 1334. The violation of the automatic stay is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and the false light invasion of privacy matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Further, the parties filed consents agreeing to allow the Bankruptcy Court to render a final decision on the false light claim.

## B. Basis for the District Court's Jurisdiction.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334.

## C. Filing Dates Establishing the Timeliness of the Appeal.

The order Zokaites has appealed was dated January 14, 2015 and Zokaites filed his Notice of Appeal on January 26, 2015. The within appeal was therefore timely.

## D. The Appeal is from a Final Order/Judgment.

The within appeal is from a final order of the Bankruptcy Court that entered judgment in favor of Lansaws and against Zokaites in the amount of $50,100.

## II.    Issues Presented for Review and
## Concise Statement of the Applicable Standard of Review:

<u>Issues for Review:</u>

A.    <u>Res Judicata.</u>  The Lansaws filed a complaint for injunctive relief and for damages in 2006 in which, among other things, they raised claims of Zokaites having violated the automatic stay. The Honorable Judith K. Fitzgerald held a two day trial in 2006 on Lansaws' complaint, granted the injunction, allowed the Lansaws to terminate the Zokaites lease, did not grant damages on the alleged stay violations, and then closed the adversary proceeding.

1.    The first issue is that the Judge Agresti erred as a matter of law and fact in denying Zokaites' Motion to Amend Response to Debtor's Objection to Claim raising the legal principle of *res judicata* in that Judge Fitzgerald's refusal to award monetary damages after the full two day trial acted as *res judicata* for any further proceeding including the proceedings before Judge Agresti in August, 2014 that he formed a new case on his own accord.

2.    The second issue is that Judge Agresti's playing a short audio recording that was not an order of court of any sort of Judge Fitzgerald to support his denial of Zokaites' Motion was taken out of context.

B.    <u>Damages for Emotional Distress.</u>  Judge Agresti awarded Lansaws damages for their claimed emotional distress.

1.    It was error to award Lansaws any emotional distress damages in the absence of any expert medical testimony or other credible evidence.

2.    It was error to not require Lansaws to introduce any evidence to establish causation between their claimed emotional distress and the actions of Zokaites.

3.    The damage award was improper because it was entirely speculative.

C.    Punitive Damages.

1.    The first issue is Judge Agresti awarded Lansaws punitive damages that was unnecessary as a deterrence to Zokaites since Judge Fitzgerald lifted the injunction against him more than nine years prior to the 2014/2015 proceedings.

2.    The second issue is that Judge Agresti erred in awarding punitive damages when the Lansaws failed to introduce any evidence of the financial wherewithal of Zokaites and whether he could afford and pay or not pay for such an award. It is a further issue as to whether Judge Agresti erred in himself researching and extracting or inferring such evidence of Zokaites' financial wherewithal and whether such inferences were entirely speculative and erroneous because he relied on nine year old general background testimony.

3.    The third issue is that Judge Agresti erred in relying on the factors he did in awarding punitive damages.

4.    The fourth issue is that Judge Agresti improperly allowed the prior recorded testimony of attorney Donald Calaiaro and he used such testimony to support his conclusion as to one of the factors for punitive damages.

D.    Agresti Offer of Judgment.  Judge Agresti erred in denying Zokaites' Offer of Judgment when the Lansaws received an award of zero on their false light claim compared to Zokaites' offer of judgment of $25,000.

E.    To the extent it was appropriate to award Lansaws any damages, Judge Agresti erred as a matter of law in failing to rule that any award for Lansaws constituted property of the estate.

Standards of Review:

The standards which the courts of appeals would apply in reviewing district court decisions apply equally to district court review of Bankruptcy Court decisions. *DiFederico v. Rolm Co.,* 201 F.3d 200, 204 (3d Cir. 2000).

The standard of review for legal findings is plenary. *In re Livingston & Co., Inc.,* 186 B.R. 841, 848 (D.N.J. 1995); and application of legal standards to the facts. *DiFederico, supra.*

The standard of review applied to factual determination is the clearly erroneous standard. *In re Livingston & Co., Inc., supra; DiFederico, supra.*

Under this standard, "it is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *DiFederico, supra; Coalition to Save Our Children v. Board of Educ.,* 90 F.3d 752, 759 (3d Cir. 1972).

# III.    Statement of the Case:

## A.    Nature of the Case, Procedural History and Facts.

Zokaites incorporates by reference the Bankruptcy Court's January 14, 2015 Memorandum which contains a narrative of the nature of the case, the procedural history and the facts. [Appendix, A51-91; DDE # 218].

Additionally, Zokaites would like to point out that Lansaws asserted four violations of the automatic stay as a "counterclaim" in their Objection to Zokaites' Claim by incorporating these alleged violations in their Complaint for Injunctive Relief.[1] Lansaws alleged that they sustained damages in the form of emotional distress.[2] They also seek punitive damages but again only as a counterclaim in their Objection to the Claim of Zokaites. As demonstrated below, Lansaws failed to prove offer any legitimate evidence or proof as to emotional distress damages.

## B.    Rulings Presented for Review

The ruling presented for review in this appeal is the order entered by Judge Agresti on January 15, 2015 in which he awarded the Lansaws $50,100 for both compensatory and punitive damages on the alleged violation of the automatic stay. (Appendix, A50; DDE 219).

---

[1] Lansaws also filed state law claims for defamation and interference with contractual relations, both of which were stricken by Judge Fitzgerald on Zokaites' Motion for Summary Judgment. Lansaws also filed the state law claim of false light that was subject to the grant of a non-suit by Judge Agresti.

[2] They also claimed they sustained damages for loss of business but they were unable to introduce any evidence at all at the trial on this claim so Judge Agresti properly refused to award them anything on this claim.

## IV.   Summary of the Argument:

A.   <u>Res Judicata</u>. Lansaws filed a Complaint for Injunctive Relief that included a request for damages. Following a full two day trial in 2006, Judge Fitzgerald granted the request for injunctive relief and also granted Lansaws request to terminate the Zokaites lease. Notably, Judge Fitzgerald did not award Lansaws any monetary damages. Zokaites filed a Motion to Amend his Answer to Lansaws' Objection in which they re-asserted their claim for damages. Judge Agresti improperly denied this Motion, opened a new adversary on his own accord, and in an attempt to support his denial, played an audio tape of Judge Fitzgerald that was casually made and was taken out of context.

B.   <u>Emotional Distress Damages</u>. The law is unsettled in the area of determining what evidence is required to support a claim for emotional distress. Nevertheless, Lansaws claim they continued to have emotional distress nine years after the stay violations. They introduced no medical bills and brought in no doctor to support their claim which was substantial error. Similarly deficient was Lansaws' failure to introduce any evidence of causation. Finally, Judge Agresti's award was not based on the record but entirely speculative.

C.   <u>Punitive Damages</u>. Judge Agresti's award of punitive damages was unnecessary as deterrence to Zokaites since Judge Fitzgerald lifted the injunction lodged against him nine years ago and there has been no incidents since. Further,

Judge Agresti used general background testimony from nine years ago to try to meet the required factor of the financial wherewithal of the defendant. Finally, Judge Agresti improperly allowed and relied upon the recorded testimony of Lansaws' former attorney in a different case to support the award of punitive damages although said attorney testified live during the trial.

D.　　Offer of Judgment.　Judge Agresti improperly denied Zokaites' Offer of Judgment that was comprised of two separate offers, one for the claim of false light and the second for the stay violations. The offer of judgment should have been accepted because Zokaites' offer on the false light exceeded the amount of the award to Lansaws which was zero.

E.　　Property of the Estate.　To the extent an award should be made in favor of the Lansaws, Judge Agresti failed to address at all that the award constitutes property of the estate.

# V.    Argument:

A.    <u>Res Judicata.</u>  The Lansaws filed a complaint for injunctive relief and for damages in 2006 in which, among other claims, they raised claims of Zokaites having violated the automatic stay. The Honorable Judith K. Fitzgerald held a two day trial on Lansaws' complaint in 2006, granted the injunction, allowed the Lansaws to terminate the Zokaites lease but did not grant damages on the alleged stay violations and then closed the adversary proceeding.

(1)    The first issue is that Judge Agresti erred as a matter of law and fact in denying Zokaites' Motion to Amend Response to Debtor's Objection to Claim raising the legal principle of *res judicata* in that Judge Fitzgerald's refusal to award monetary damages after the full two day trial acted as *res judicata* for any further proceeding including the proceedings before Judge <u>Agresti in August, 2014 and that he formed a case on his own accord.</u>

On or about July 22, 2014, Zokaites filed a Motion to Amend Response to Debtor's Objection to Claim of Frank Zokaites. (Appendix, A92-A104; DDE 150). Then, on or about August 1, 2014, Zokaites filed his Supplemental Brief on Motion to Amend Response to Debtor's Objection to Claim of Frank Zokaites. (Appendix, A 105-A108; DDE 174). Zokaites sought leave to amend to raise the defenses of res judicata and collateral estoppel. The reasons for Zokaites' request for leave to amend was set forth in Paragraph 20 of the Motion as follows:

20. This Motion is being presented now and not before because of the complexity of the entire Lansaw bankruptcy proceedings, the number of docket entries, the procedural difficulties and the fact that these important issues were unknown to Zokaites until his preparation for the mediation and trial. This Motion is therefore not being presented in bad faith.

(Appendix, A 96-A97; DDE 150).

While Judge Agresti granted leave to amend, he held that:

…however, the Defendant has failed to support the ultimate relief requested in the Motion based upon prior rulings and comments of the Hon. Judith Fitzgerald who was formerly assigned to this case…

(Appendix, A109; DDE 185).

In reaching this conclusion, Judge Agresti relied upon an audio excerpt from a hearing before Judge Fitzgerald on a Motion for Summary Judgment that was argued before her on or about June 18, 2009 in which Zokaites sought dismissal of the Lansaws' claim for punitive damages arising out of the alleged stay violations.

In that excerpt, Judge Fitzgerald said:

The Court: Mr. Hulton, it's irrelevant. He chained the door. It's an action to control property of the estate or obtain property of the estate. It's a violation of the stay. He had notice it's subject of punitive damages.

(Appendix, A304-A305; DDE 233).

Zokaites respectfully contends that Judge Agresti erred in its holding for two reasons.

First, his sole reliance upon Judge Fitzgerald's decision in denying a Motion for Summary Judgment was reversible error because the defenses of *res judicata* and collateral estoppel were not before Judge Fitzgerald. That was the very reason for seeking leave to amend, which Judge Agresti granted.

Second, a review of the record detailed below compels the conclusion that Zokaites has demonstrated that *res judicata* and collateral estoppel bar the within action. It should be noted that Judge Agresti failed to provide any analysis of the defenses of *res judicata* and collateral estoppel.

The factual and procedural history giving rise to these defenses are as follows:

Twelve days after filing their petition for relief under the Bankruptcy Code, on or about August 28, 2006, the Lansaws filed a Complaint for Injunctive Relief at Bankruptcy case no. 06-23936-TPA and at Adversary Proceeding No. 06-02645. (Appendix, A135).

In that Complaint, the Lansaws alleged that Zokaites violated the automatic stay in the following particulars: (a) entering the leased premises on August 21, 2006, with undersigned counsel to photograph the Lansaws' personal property; (b) interference with the Lansaws' then new landlord by undersigned counsel sending

him allegedly derogatory information; (c) filing objections with Pine Township concerning the new leased premises; and (d) allegedly chaining the doors to the old premises on the weekend of August 26-27, 2006. In this Complaint, the Lansaws sought both injunctive and monetary relief. (Appendix, A93; DDE 150).

Then, on September 9, 2006, the Lansaws then filed a motion to reject the unexpired lease they had with Zokaites. Judge Fitzgerald consolidated both actions, the parties engaged in extensive, consolidated discovery and a full trial on both actions was held before Judge Fitzgerald on October 3 and 4, 2006. (Appendix, A93; DDE 150).

Following the two day trial, Judge Fitzgerald issued a Memorandum Opinion. (Appendix, A. 169, DDE 91). She held that there was an acrimonious relationship between the Lansaws and Zokaites, that Zokaites violated the automatic stay, and then granted the Lansaws' Motion to Reject the lease. Judge Fitzgerald also entered an injunction barring Zokaites from entering the leased premises. (This injunction was later lifted). Most importantly, Judge Fitzgerald refused to award the Lansaws any monetary damages whatsoever. Instead, the Court sanctioned Zokaites by for the alleged stay violations by permitting the Lansaws to reject the Zokaites lease and by enjoining him from the leased premises. (Appendix, A94; DDE 150).

Then, on February 23, 2007, the Lansaws filed an Objection to the Claim of Frank Zokaites. In that Objection, the Lansaws raised the same matters that were raised in the Complaint seeking injunctive relief and for monetary damages arising out of the alleged automatic stay violations. (Appendix, A 37-41; DDE 1). In Zokaites' response, he failed to assert the affirmative defenses of *res judicata* and collateral estoppel. (Appendix, A 42-49; DDE 2).

On July 22, 2014, Zokaites filed his Motion to Amend Response to Debtor's Objection to Claim of Frank Zokaites. In that Motion, Zokaites sought leave to assert the affirmative defenses of *res judicata* and collateral estoppel. (Appendix, A92-104; DDE 150).

It is well-settled that in order to successfully raise the defense of *res judicata*, the party asserting the defense must demonstrate that: (1) there has been a final judgment on the merits in a prior suit; (2) the prior suit involves the same parties or their privies and (3) the subsequent suit is based upon the same causes of action. *United States v. Athlone Industries, Inc.,* 746 F.2d 977, 983 (3d Cir. 1984).

Further, there are three considerations relevant to the inquiry into whether there is an identity of causes of action. The three considerations are: (1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same for both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary

at trial are the same (that is whether the same evidence necessary to maintain the second action would have been sufficient to support the first) and (3) whether the material facts alleged are the same. *Purter v. Heckler,* 771 F.2d 682 (3d Cir. 1985).

With respect to collateral estoppel, the Third Circuit has required varying combinations of the following elements to be present in order for collateral estoppel to apply to bar re-litigation of an issue already having been decided:

> (a) The issue sought to be precluded is the same as that decided in the prior action;
>
> (b) That issue was actually litigated in the prior action;
>
> (c) The resolution of that issue was determined by a valid and final judgment on the merits;
>
> (d) The resolution of such issue must have been essential to the prior judgment;
>
> (e) The party against whom the bar of collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and
>
> (f) The party against whom such bar is asserted had a full and fair opportunity to litigate the issue in question in the prior action.

In the case at bar, Zokaites meets *all* of the factors so there is no doubt that both *res judicata* and collateral estoppel bar the Lansaws' claim for automatic stay damages that is presently before this Honorable Court.

The Complaint for injunctive relief and for monetary damages filed at adversary proceeding no. 06-02645 asserts violations of the automatic stay that are identical to the assertions that were asserted in their Objections that Judge Agresti ruled upon. The request for damages are identical. Judge Fitzgerald held a two day trial on the Lansaws' Complaint and refused to award them any monetary damages instead affording them the remedy of rejecting the lease and further affording them injunctive relief. That suit was a final judgment on the merits and the subsequent suit presently before the Court litigated the same claims.

Judge Agresti's Memorandum Opinion is replete with references to and reliance placed upon the facts and legal issues raised in the October, 2006 trial. In the Procedural History section of the Memorandum Opinion, Judge Agresti wrote:

> The main bankruptcy case was filed on August 16, 2006, with the Lansaws being represented by Attorney Stanley Kirshenbaum at the time. On August 28, 2006, the Lansaws initiated an adversary proceeding by filing a Complaint for Injunctive Relief against Zokaites, alleging that Zokaites had violated the automatic stay in a number of respects in connection with the Daycare. *See, Adv. No. 06-02645, Doc. No. 1.* In addition, the Lansaws filed a motion seeking a temporary restraining order and/or a preliminary injunction to enjoin Zokaites from any further interference with the operation of their business and their quiet enjoyment of the premises they were leasing from him. *Adv. No. 06-02645,* Doc. No. 2. That adversary, *although now closed,* was the genesis of the claim in the present case for damages resulting from Zokaites' violations of the automatic stay.

(emphasis added) (Appendix, A 53; DDE 218).

Judge Agresti further wrote:

> It should also be kept in mind that that the Court is not writing on a blank slate in this matter…it is nonetheless true that many of the same factual issues that she faced at that time are equally relevant here….

(Appendix, A55-56; DDE 218).

In the section of the Memorandum Opinion, Violation of Automatic Stay, Judge Agresti discussed some of the evidence that he relied upon in support of his award of damages as follows:

> The Court was in general favorably impressed with the testimony and credibility of the Lansaws and is of the view that they did experience emotional distress as a direct result of Zokaites' conduct. That conclusion is bolstered by the findings made by Judge Fitzgerald in her December 12, 2006 Opinion. She notes therein that Mrs. Lansaw was "quite upset" by the August 21, 2006 incident and was "in tears" in various appearances before the court. *Id*. at 6, 8. Judge Fitzgerald also concluded that: 'Mrs. Lansaw is, in fact, so distressed by Zokaites' offer to waive a variety of claims to keep Debtors as tenants, she is unable to work in a premises (sic) which he owns.'

(Appendix, A 66; DDE 218).

In discussing what the Court considered supporting evidence for the Lansaws' emotional distress claim, Judge Agresti, again relying upon testimony adduced at the earlier trial, wrote:

In the present case, during the August trial held before the Undersigned the Lansaws did not provide any extrinsic evidence to support their emotional distress damage claim, although in some measure each of them provided testimony about the observed effect on the other, so to that extent it could be viewed as corroborating extrinsic evidence. Additionally, at the October 2006 trial held before Judge Fitzgerald there was some more unambiguously extrinsic evidence presented to support the existence of emotional distress. Judge Fitzgerald stated that she credited the testimony at the trial of a Daycare employee named Linda Huston that Mrs. Lansaw since the incidents involving Zokaites was not functioning well at work and that she exhibited behavior at work that was very similar to her behavior in the courtroom. December 12, 2006 Opinion at 9. Ms. Huston also testified that this was a significant change in Mrs. Lansaw's behavior. *Id.* Mr. Lansaw also testified at the October 2006 trial that because of her experiences in this regard his wife was frequently ill, vomiting and cried a lot.

(Appendix, A67-68; DDE 218).

It should be noted that Ms. Huston did not testify in the August, 2014 trial. She testified only in the 2006 trial.

Based upon the foregoing, it is clear that the record before Judge Agresti established the affirmative defenses of *res judicata* and collateral estoppel. In holding that Zokaites failed to establish the elements of these defenses, Judge Agresti committed reversible error.

(2)     The second issue is that Judge Agresti's playing a short
         audio recording that was not an order of court of any sort
         of Judge Fitzgerald to support his denial of Zokaites'
         <u>Motion was taken out of context.</u>

In rejecting Zokaites' *res judicata* and collateral estoppel defenses, the Court solely relied upon an argument before Judge Fitzgerald that occurred on June 18, 2009. During that hearing, undersigned counsel argued a motion for summary judgment in which he urged the court to dismiss the Lansaws' claims for damages arising out of the alleged violation of the automatic stay. During the August, 2014 hearing in this case, Judge Agresti instructed his Law Clerk to play an excerpt of the audio record of that June 18, 2009 hearing before Judge Fitzgerald.

In that excerpt, Judge Fitzgerald stated as follows:

> The Court: Mr. Hulton, it's irrelevant. He chained the door. It's an action to control property of the estate or obtain property of the estate. It's a violation of the stay. He had notice it's subject of punitive damages.

(Appendix, A304-305; DDE 233).

The casual comment by Judge Fitzgerald was just that it; was not an order, and Judge Fitzgerald did not re-open the closed 2006 case.

Zokaites does not dispute that he didn't raise the defenses of collateral estoppel and *res judicata* prior to seeking leave to do so now. In his motion to amend, Zokaites alleged that:

> 20. This Motion is being presented now and not before because of the complexity of the entire Lansaw bankruptcy proceedings, the number of docket entries, the procedural difficulties and the fact that these important issues were unknown to Zokaites until his preparation for the mediation and trial. This Motion is therefore not being presented in bad faith.

(Appendix, A96-97; DDE 150).

The Court granted the Motion to Amend, but then ruled that, "the Defendant has failed to support the ultimate relief requested in the Motion based upon the prior rulings and comments of the Hon. Judith Fitzgerald who was formerly assigned to this case." (Appendix, A109; DDE 185).

The Court did not make any findings concerning the elements of *res judicata* and collateral estoppel but relied solely on Judge Fitzgerald's out of context discussion with the undersigned in denying Zokaites' Motion for Summary Judgment on that issue. In so holding, Judge Agresti erred.

The defenses of *res judicata* and collateral estoppel were not before Judge Fitzgerald in June, 2009. The trial occurred in October, 2006. Then prior to June, 2009, the matter again came before the court on what was an objection to Zokaites' claims in which Lansaws sought an offset against Zokaites' claim. Judge Fitzgerald did not rule on the issue of *res judicata* or collateral estoppel because they were not before her. It was error for Judge Agresti to rely upon Judge Fitzgerald's denial of

summary judgment as a basis for holding that Zokaites failed to make out these defenses.

B. <u>Damages for Emotional Distress.</u> Judge Agresti awarded Lansaws damages for their claimed emotional distress. As detailed below, there were multiple errors committed in making such an award.

(1) Law concerning the award of emotional distress damages
<u>arising out of a violation of the automatic stay.</u>

The issue of whether damages for emotional distress are compensable for a willful violation of the automatic stay and the consequent proof required are an unsettled question in this District and there is a substantial split in authority in the other Districts. One of the central issues concerning the split in authority is the element of fraud inherent in such claims.

The U.S. Court of Appeals for the Seventh Circuit confronted the issue in *Aiello v. Providian Financial Corp.,* 239 F.3d 876 (7th Cir. 2001). In *Aiello*, the debtor filed for relief under chapter 7. A creditor threatened to pursue a fraud charge against Aiello if she did not reaffirm a certain debt she owed. Aiello pursued emotional distress damages resulting from the perceived stay violation. The bankruptcy and district courts concluded that Aiello needed more proof than her affidavit attesting that the creditor's threat caused her to cry, quarrel with her spouse and feel nauseous.

Judge Posner, writing for the panel, noted that the automatic stay provides purely financial protection to a debtor without reference to "protection of peace of mind." He intimated that bankruptcy judges are ill-suited to properly evaluate emotional injury claims. These two observations, along with the notion that §362(k) is not a font of tort law but rather a measure to protect only the rights conferred by the automatic stay, provoked the panel to more sharply confine the bankruptcy court's damage award authority for stay violations.

The Seventh Circuit concluded that, absent a tangible financial injury resulting from a stay violation, §362(k) did not authorize the imposition of damages for emotional distress. If a tangible financial injury is shown, however, the Court said that a bankruptcy court might be authorized to supplement a compensatory damage award with an additional, modest tack-on for emotional injury beyond mere "transient and trivial shock ...."

Thus, according to the Seventh Circuit, a plaintiff could recover for emotional injury if it was first established that there had been some actual financial loss under the "cleanup doctrine" or judicial economy of piggybacking claims for damages. The Seventh Circuit, however, made it clear that absent a showing of financial loss, a claim for purely emotional distress failed.

The following passage in *Aiello* is worthy of citation in its summing up the concerns. Judge Posner said:

> The law has always been wary of claims of emotional distress, *because they are so easy to manufacture*. For a long time damages for such distress were generally limited to cases in which the plaintiff was able to prove some other injury. See *Restatement (Second) of Torts* § 46 comment b, § 436A (1965); W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 54, pp. 361-65 (5th ed. 1984); Archibald H. Throckmorton, "Damages for Fright," 34 Harv. L. Rev. 260 (1921). The courts have grown more confident of their ability to sift and value claims of emotional distress, and the old limitations have largely been abandoned; but *suspicion lingers, as illustrated by two recent Supreme Court decisions*, *Metro-North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 428-38, 138 L. Ed. 2d 560, 117 S. Ct. 2113 (1997), and *Consolidated Rail Corp. v. Gottshall,* 512 U.S. 532, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994), and by cases, most recently our decision in *Alston v. King,* 231 F.3d 383, 388-89 (7th Cir. 2000), where we set a high threshold for proof of damages for emotional distress caused by a denial of due process of law.

(emphasis added). *Id.* at 881.

In *Dawson v. Washington Mutual Bank,* 390 F.3d 1139 (9th Cir. 2004)*,* the Ninth Circuit Court of Appeals took a different approach, looked at the legislative history of Section 362(h) (the predecessor to 362(k)) and determined that emotional distress damages were a cognizable claim if the plaintiff provides "*clear evidence to establish that significant harm occurred as a result of the violation….*" *Dawson,* at 1148-1149 (emphasis added). The Ninth Circuit went on to set forth the standard for examining whether an award of damages for emotional distress was warranted or was frivolous. It held that "to be entitled to damages for emotional distress under 362(h), an individual must: (1) suffer significant harm, (2)

clearly establish the significant harm, and (3) demonstrate a casual connection between that significant harm and the violation of the automatic stay (as distinct, for instance, from the anxiety and pressures inherent in the bankruptcy process)." It noted that "an individual can prove entitlement to emotional distress damages even in the absence of corroborating evidence and even in the absence of an egregious violation, if the individual in fact suffered significant emotional harm and the circumstances surrounding the violation make it obvious that a reasonable person would suffer significant emotional harm."

Regarding the first element, the Court observed that "[f]leeting or trivial anxiety or distress does not suffice[,]" and the Court stressed that a debtor must demonstrate "significant emotional harm." *Id.* at 1149.

Regarding the second element, the suggested means for establishing that harm included: (1) corroborating medical evidence; (2) the testimony of non experts, such as family members, friends, or coworkers, that clearly establishes that the debtor suffered significant emotional harm; (3) egregious conduct on the stay violator's part, such as a cited case where a creditor broke itno the debtor's home at night, doused the lights and pretended to hold a gun to the debtor's head; or (4) other unusual circumstances making it "obvious that a reasonable person would suffer significant emotional harm." *Id.* at 1149-50.

Regarding the third element, the Court said that the debtor must show he or she was "injured by" the violation such that there is a "causal link between the violator's acts" and "the harm must be clearly established or readily apparent." *Id.* at 1150.

The U.S. Court of Appeals for the Fifth Circuit has similarly weighed in on the issue in the case of *In re Repine,* 536 F.3d 512 (5th Cir. 2008). In this case, a lawyer representing a wife in a child-support enforcement action was awarded $2,027 in attorney fees. The husband was incarcerated thereafter for a period of time for criminal contempt arising out of his failure to pay support. The attorney fee award was reduced to judgment, and a lien was filed by the wife's lawyer against the husband's property. Later, the husband sought protection under chapter 13 and his lawyer provided notice of the filing to the wife's lawyer. Thereafter, the wife's attorney ignored the wife's wishes that the husband be released from jail in part to attend his father's funeral, failed to appear before the bankruptcy court despite being ordered to do so and persisted in her efforts to collect her attorney fee judgment despite the bankruptcy court's warning that all collection efforts cease. The husband ultimately sought damages from the wife's lawyer for violation of the automatic stay.

The bankruptcy court awarded the husband $27,280 in actual damages including $4,400 for emotional distress. The district court affirmed. On appeal, the wife's lawyer contended that emotional injury damages were not contemplated by §362(k) unless some physical manifestation of the injury was present. The panel noted its agreement with the hesitation expressed by Judge Posner in *Aiello*, *supra,* that "emotional damages are easier to manufacture than other types of damages." The Court concluded that emotional injury damages could be awarded under §362(k) if "specific information" supported the award rather than mere "generalized assertions." *Id.* at 521-22 (citation omitted). The Court went on to note that:

> [W]e need not adopt a precise standard for whether, or under
> what circumstances, a court may
> award emotional damages under §362(k) because we find
> that… [the husband] has not made th[e] minimal showing. With
> respect to his alleged emotional damages...[he] testified that he
> felt "very upset" at what his sons would think of him for being
> in jail. He also testified that it was "very traumatic" for him to
> miss his father's funeral, that he still had dreams about it, that it
> came to mind when he interacted with people in the community
> who knew he missed the funeral and that he may never get over
> it. We do not doubt...[his] testimony, but these generalized
> assertions are insufficient to support
> an emotional damages award under §362(k). And the fact
> that...[his] emotional injury was accompanied by financial loss
> cannot cure this deficiency.

*Id.* at 523. Therefore, the award was reversed.

The U.S. District Court for the Northern District of Ohio faced a similar case and based its conclusion that Section 362(h) authorized compensation for "only tangible/economic injuries" on *Aiello, supra. See United States v. Harchar,* 331 B.R. 720 (N.D. Ohio 2005). In that case, the court, consistent with *Aiello,* said that emotional distress damages were not compensable under Section 362(h) and thus rejected the holding in *Dawson*.

In this District, the Third Circuit Court of Appeals has not ruled on this issue. The lone authority appears to be a bankruptcy case out of the Western District authored by the Honorable Jeffrey Deller which is the case of *In re Wingard,* 382 B.R. 892 (Bankr. W.D. Pa. 2008) in which Judge Deller adopted the Ninth Circuit's approach in *Dawson* that was never appealed. It is this case which Judge Agresti specifically and solely relied upon.

In *Wingard,* the automatic stay violation involved a few collection letters and a telephone dunning call to the debtor. Judge Deller framed the issues before him as first whether the debtors could recover damages if the injury was solely related to emotional distress damages as opposed to a physical injury. Second, he made a determination of what type of evidence a debtor must produce in order to support a claim for emotional distress under Section 362(k) namely, under what circumstance must the debtor introduce extrinsic evidence beyond mere self-serving testimony of the debtors themselves to support proof of psychological

injuries.

As to the first issue, Judge Deller adopted the approach taken in *Dawson* and held that psychological injuries are recoverable under Section 362(k) absent physical injury.

As to the issue of proof, and again relying on *Dawson,* Judge Deller held that "The case law in this area provides that when the willful violator of the automatic stay has engaged in conduct that is patently or obviously egregious, emotional distress injuries may be proven by credible debtor testimony alone without resort to other extrinsic and corroborating evidence."

In instances where the conduct is not patently egregious, Judge Deller said that the debtor must show: (1) he suffered significant harm; (2) clearly establish the significant harm (i.e. prove it with reasonable certainty and mere speculation, guess or conjecture will not suffice); and (3) demonstrate a casual connection between the significant harm and the violation of the automatic stay. Judge Deller went on to say that to prove significant harm, courts require debtors prove emotional distress through the introduction of corroborating extrinsic evidence beyond mere self-serving testimony.

Respectfully, Judge Deller did not fully apply the *Dawson* factors and missed important considerations. Particularly, *Dawson* requires a debtor to meet *all* three of the above factors and not, as Judge Deller said, only meet all three factors

in a non-egregious case. As an example, assuming the egregious case in which the creditor held a gun to the debtor and demanded his money. The debtor then sues for a stay violation and claims he broke his leg. Clearly the debtor must establish causation.

Weaving back to the *Dawson* factors, the first element of a showing of significant harm, the *Dawson* court did not elaborate as to what significant harm is, but said that "fleeting or trival anxiety or distress" does not count. Citing the case of *In re Skeen*, 248 B.R. 312 (E.D. Tenn. 2000) which was a case in which the debtor was "torn-up, shaken and nervous as a result of telephone calls. However there was no evidence that she sought medical relief or that the anxiety caused by the creditor's actions rendered her incapable of going about her daily routine.

The requirement that the harm be "significant" is important because it addresses concerns that awarding damages for emotional distress opens the door for frivolous claims. *Dawson,* at 1149.

The standard of "fleeting and inconsequential" should focus on factors such as (1) whether there is a physical manifestation of the emotional distress, (2) what effect the distress would have on a reasonable person's daily life, (3) whether the debtor sough medical treatment, (4) displays of other objective manifestations. To ensure that the harm is significant, courts should require that there be a physical manifestation of the emotional distress and absent such physical manifestation, no

damages shou8ld be awarded. *See e.g., In re Jackson,* 309 B.R. 33 (Bankr. W.D. Mo. 2004).

The second *Dawson* element which is the most comprehensive and most important in this case concerns the debtor's proof. The *Dawson* court ruled that the debtor must clearly establish the significant harm alleged and this goes to what type of proof must be shown. (This issue has long been a hotbed of controversy both in the Federal and state courts).

In addressing this element, *Dawson* addressed four ways a debtor could prove his emotional distress damages: (1) by offering corroborating medical evidence, (2) through non-expert testimony as to the debtor's manifestations of mental anguish, (3) where there is egregious conduct and the harm is readily apparent, or (4) where there is no egregious conduct by the circumstances make it obvious that a reasonable person would suffer significant emotional harm. *Id.* at 1149-50.

The use of corroborating medical testimony is obviously the most reliable because it is difficult to ignore scientific evidence supporting some sort of manifestation. *Id.* Proof of emotional distress damages through testimony of non-experts is questionable and unreliable because these non-experts include family, friends and co-workers all of whom are biased and fraught with the possibility of fraud. *Id.* When the non-expert is also an interested party, this testimony alone with

nothing more should not serve as the basis for proving a claim for emotional distress because it can open the floodgates for allowing frivolous claims. As for egregious conduct, this possibility is somewhat more reliable but a debtor must still show that the emotional distress claimed was caused by the act and that the harm was reasonable and readily apparent. *Id.* Significantly, courts must be cautious, however, not to provide in actual damages what should be provided through punitive damages. Just because it is sufficient for the egregiousness of the act to provide the basis for proving that the emotional distress existed, it should not also skew the award given which should be based purely on the damages sustained by the debtor. Lastly, a debtor can prove emotional distress damages where there is no egregious creditor conduct but the circumstances make clear that a reasonable person would suffer significant emotional harm. Judge Posner in *Aiello* rejected this out of concern that the floodgates would open for frivolous claims. *Id.* at 1150.

The final hurdle a debtor must clear to establish a claim for emotional distress damages under *Dawson* is to demonstrate causation between the claimed harm and the stay violation act. Indeed, the *Dawson* court said that Section 362 itself required that the debtor be "injured by" the violation. *Id.*

As noted, the Third Circuit Court of Appeals has not had occasion to make its own ruling and establish standards on this unsettled issue of emotional distress damages resulting from a violation of the automatic stay. However, the Third

Circuit has had occasion to make rulings on emotional distress claims in other contexts. For example, in the case of *Spence v. Board of Education,* 806 F.2d 1198 (3d Cir. 1986), the court affirmed a remittur based on a lack of evidence to support an award of damages for emotional distress. In that case the plaintiff, an art teacher, testified that "she was depressed and humiliated [when she was transferred to another job] and that she lost her motive to be creative." However, she produced no evidence that she had lost income, suffered physically or undergone counseling as a result of the incident. The Third Circuit upheld the trial court's remittur because neither the circumstances nor the testimony met the applicable burden of proof which requires the plaintiff to "establish that there was a reasonable probability, rather than a mere possibility, that damages due to the emotional distress were in fact incurred."

In making its ruling, the Third Circuit relied on a number of cases including a Supreme Court case of *Carey v. Piphus,* 435 U.S. 247 (1978) in which the Court held that substantial compensatory damages could not be awarded absent proof that actual injury resulted from the act (which in that case was the denial of due process). Based on this Supreme Court case, the Third Circuit in *Spence* said that an award for emotional distress damages must be based on proof that such an injury was actually caused.

Importantly, and apparently in complete rejection to the *Dawson* standards that Judge Deller and then Judge Agresti relied upon, was that the Third Circuit rejected the assertion that damages may be presumed [such as in the egregious stay violation cases]. The Third Circuit, noted that the Supreme Court said that the presumption of emotional distress damages was "an oddity in tort law" and has been applied only in very limited circumstances chiefly in the area of defamation *per se* cases. *Carey,* 435 U.S. at 262 (quoting *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974)). In concluding, the Third Circuit made the sensible comment that "We see no particular difficulty in producing evidence that the mental and emotional distress actually was caused….Neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused." *Spence,* at 1200.

\*\*\*

Even Judge Agresti himself noted during the trial the following in response to the objection of Mrs. Lansaw testifying about her alleged injuries and medications: "Overruled. Yes she can. I mean it's the weight that's given to it. A lay person can testify as to what meds they are taking, what they believe it's for. Expert testimony "now the ultimate diagnosis as to the cause. That's an expert opinion, but go ahead. (As to meds and ulcers). (Appendix, A355).

In addition to Federal law, Pennsylvania law mandates extrinsic evidence in the form of expert testimony to prove causation and emotional distress damages in general. *Kazatsky v. King David Memorial Park, Inc.,* 527 A.2d 988 (1987); *Wecht v. PG Publishing Co.,* 725 A.2d 788 (Pa.Super 1999); Restatement (Second) of Torts, § 652E. The reason for requiring medical or other hard evidence is to ensure that the psychological injury is real and not feigned or made up and to ensure that a cottage industry of filing questionable emotional distress claims does not clog the dockets.

(2)     It was error to award Lansaws any emotional distress damages in the <u>absence of any expert medical testimony or other credible evidence.</u>

The record shows that Mrs. Lansaw testified that *as a result of the sign*[3] and continuing to this day she has nightmares about Zokaites entering the building and taking her business away; that she wakes up screaming and crying, that he's following her, and that when she is out in public and sees someone who looks like Zokaites she experiences "sheer fear." She testified that she has stress ulcers that she takes two medications for, and that she takes two medications for depression. (Appendix, A354-355). She said the ulcers are from stress, not bacteria. (*Id.* at A427). She testified that she went to a doctor for depression and got medications. (*Id.* at pg. A360). She testified that she continues to have emotional distress to this

---

[3] The sign related to Lansaws' claim for false light which was a pre-petition incident. As detailed above, this claim was stricken on Zokaites' oral motion for a non suit.

day. (*Id.* at A426). She said "I don't know where it stops, where it escalates to." (*Id.*).

Mrs. Lansaw admitted that in spite of her long lasting depression, she never consulted or obtained treatment with a psychologist but that "I am considering it." (*Id.* at A429). She also admitted that she has not told any of her doctors that her depression is from Zokaites. (*Id.* at A430).

Mrs. Lansaw, like Mr. Lansaw, introduced not one shred of documents evidencing her emotional distress, evidencing her testimony that she has ulcers, let alone stress ulcers instead of bacteria ulcers, or evidencing that she has depression. Nor did she have any doctor come in to testify as to her claimed emotional distress, her claimed depression and her claimed ulcer. (*Id.* at A417).

In addition to Mrs. Lansaw having failed to introduce any extrinsic evidence to prove her claims with either medical records or testimony from a doctor, she also admitted that she didn't even bring in any receipts documenting that she takes medications. (*Id.* at A430). Shockingly, she testified on re-direct by Mr. Lansaw that she had medications in her purse but she surprisingly failed to take any pill bottle out of her purse to prove her claims to the Court. (*Id.* at pg. A431).

Mr. Lansaw testified that he trusts no one, he has no friends other than police officers, he doesn't leave his house, he doesn't travel through Wexford because he is afraid of the police (although he also testified that he has worked at

the new day care business, which at all times was within the jurisdiction of the same Northern Regional Police Department whom he claims to fear because he thinks that Zokaites controls the entire police department), that he wakes up 5-6 times a night, and that he has 2 dogs for protection. (*Id*. at A492-493). He said he separated himself from the human race because he "might run into somebody like you guys again". (*Id.* at A497). In other parts of his testimony, Mr. Lansaw admitted that he has no fear of Zokaites. (*Id.* at A545). *He stated that the reason why he didn't bring in one medical record or one doctor was because he didn't have to show causation. (Id.* at A530). He knew that Dr. Carmen who treated Mrs. Lansaw was not a psychologist but rather a family doctor who works at an *Urgent Care*. (*Id*. at pg. A546).

Shockingly, he testified that the Northern Regional Police Department are in Zokaites' "back pocket" and that is why he stays out of the Wexford area. (*Id*. at A552). Equally shocking is his testimony that Lt. Love, a police officer, *lied* in his report when he said that Mr. Lansaw told him he had a gun on him and if anyone came through the doors he would take action. His testimony is completely contrary to the unequivocal report of Lt. Love and of course, the new day care is also in the heart of Wexford. (*Id.* at A540; Exhibit 7).

Mr. Lansaw testified about the effects on his wife that he has observed. He said that she has changed since the incidents involving Zokaites. He said she just goes to work and comes home, rarely going out in public, avoiding human conduct, and not enjoying life. (*Id.* at A493). He testified to similar effects on himself, stating that he has become withdrawn and has a fear of making new friendships. (*Id.*).

In his memorandum opinion, Judge Agresti admitted that Lansaws provided no expert medical testimony but said that wasn't fatal under *Wingard* because, in his opinion, this was an egregious case where extrinsic proof was not required. Judge Agresti said that there was extrinsic proof in his opinion because each Lansaw testified about the claimed emotional distress exhibited by the other. Judge Agresti also said that the testimony from a former employee and co-worker, Linda Huston, in 2006 said that Mrs. Lansaw was not functioning well at work. (Appendix, A169; DDE 16-17). Based on this, Judge Agresti concluded that the Lansaws had proven that they incurred emotional distress damages.

Judge Agresti's conclusions are contrary to the law and are contrary to the facts. Indeed, even under *Dawson-Wingard,* his conclusions fail.

In the case at bar, the proof problems are insurmountable and this is particularly so because: (a) the Lansaws claim their emotional distress has lasted nine years, (b) their failure to introduce evidence that their distress was manifest in

some way, (c) their claims are generalized and not specific, (d) their failure to seek any medical attention in nine years, (e) their failure to introduce corroborating extrinsic evidence of significant harm; and (f) their self serving testimony as to each other's ailments.

Significantly, the claim that their emotional distress has lasted nine years and they have not sought any medical help at all for nine years is simply not reasonable nor credible. This is not credible testimony for such distress to last for such a long period at all let alone failing to seek medical attention. It is reasonable for one to lose a few nights' sleep or perhaps even for a week. However when you allege you have distress for nine years, and have not sought treatment, it is not credible absent extrinsic medical evidence for proof.

Putting the Lansaws' proof to the law detailed above shows the award must be reversed. First, Lansaws' claims fail under the Seventh Circuit's opinion in *Aiello* because the Lansaws had no tangible financial injury resulting from the alleged stay violation. Even if they had, *Aiello* instructs that only a modest tack-on should be made under the cleanup doctrine. Thus, their claim completely fails. Indeed, and as detailed above, *Aiello* was concerned about the opportunity for fraud and that allowing such claims to exist independent of an actual loss, the floodgates for fraudulent claims would open. Indeed, such is the case here. The alleged stay violations occurred in 2006. Lansaws claim they still have emotional

distress to this very day, nine years' later. They make this claim absent any extrinsic evidence other than their own self serving testimony. Their claim is obviously fraudulent and pressed solely to collect money from Zokaites.

Second, if the Court were to instead adopt the approach in *Dawson,* there are similar problematic issues. As a general proposition, *Dawson* requires "clear evidence to establish that significant harm occurred as a result of the violation…." *Dawson,* at 1148-1149. Indeed, Judge Deller in *Wingard* said the same thing and said that to prove significant harm, courts require debtors prove emotional distress through the introduction of corroborating extrinsic evidence beyond mere self-serving testimony. Judge Agresti completely ignored this obviously necessary and critical element.

Zokaites submits that the claimed harm by the Lansaws is not significant and that it is neither credible nor reasonable that the claimed harm of nightmares and depression has lasted nine years. Rather, Zokaites submits that while there was certainly a measure of distress experienced by the Lasaws following the stay violations, the distress was "fleeting and trivial anxiety or distress" that is simply not compensable. In *In re Skeen, supra,* emotional distress damages were denied because of the failure to introduce evidence that the debtor sought medical relief. That is the case here. The Lansaws testified they did not seek any medical relief including relief from a psychologist for their claimed harm for nine years!

The claim similarly fails because there was an abject failure of required testimony concerning any physical manifestation of the claimed emotional distress. Indeed, Judge Agresti didn't even make note of this important element either instead relying upon and perhaps being blinded by the asserted egregious nature of the violations.

Similar errors were Judge Agresti's reliance on the Lansaws' own testimony to "back up their claims" fails under *Dawson* because of the obvious bias and unreliability. Further still, Judge Agresti erred because even under the egregious standard, *Dawson* requires evidence that the harm was reasonable and readily apparent. Here, the claimed harm is not reasonable after nine years and there was nothing readily apparent.

The Lansaws' claims would also fail under the Fifth Circuit's approach requiring specific testimony concerning damages rather than generalizations. This was necessary because "emotional damages are easier to manufacture than other types of damages" according to the Fifth Circuit. Here, the Lansaws' claims are nothing more than generalizations. They said they have depression-a generalization. They have nightmares and they become terrified when they see someone that looks like Zokaites-again a generalization. These claims are nothing more than legally insufficient generalizations and are far from being specific. As

detailed above, these generalized claims are most troubling since the Lansaws are claiming they still experience such distress nine years later.

If this were Ohio, the Lansaws claims would be denied under *Harchar* because of the lack of any tangible/economic injuries.

If this case was before the Court of Appeals for the Third Circuit, it would fail under *Spence* absent evidence that an actual injury occurred which is completely lacking in the case at bar. Similarly, Judge Agresti's reliance on the presumption of damages absent extrinsic proof was rejected by the Third Circuit and for this reason as well, he committed error and this case must be reversed.

Similarly, if this case were before the United States Supreme Court, the damages would be reversed because of the failure of the Lansaws to introduce any extrinsic proof. In fact, the Supreme Court noted that it didn't take much to introduce extrinsic evidence as proof of the claimed emotional distress injury.

Indeed, Judge Agresti's conclusions is at odds with his own comments during the trial in which he correctly noted that expert testimony as to causation was necessary.

Finally, if this case were in the Pennsylvania state courts, the damage award would be reversed because of the requirement of the introduction of expert medical testimony under *Wecht*.

And, as the Restatement Second of Torts says like *Aiello* says, the reason for requiring medical or other hard evidence is to ensure that the psychological injury is real and not feigned or made up and to ensure that a cottage industry of filing questionable emotional distress claims does not clog the dockets.

To conclude, Judge Agresti erred as a matter of law and fact. As his memorandum opinion shows and a detailed review of the record show, it appears that there was a measure of loss of objectivity by Judge Agresti and he overlooked important standards and overlooked the complete lack of evidence by the Lansaws to substantiate their claim.

   \*\*\*

(3)    It was error to not require Lansaws to introduce any
        evidence to establish causation between their claimed
        <u>emotional distress and the actions of Zokaites.</u>

Even under *Wingard,* and as admitted to by Judge Agresti, a debtor must demonstrate a connection or causation between the alleged significant harm and the stay violation. Moreover, a bankruptcy court may award damages attributed to emotional distress if it is shown, by a preponderance of the evidence, that the defendant's conduct in willfully violating the automatic stay caused that harm. *In re Iskric*, 496 B.R. 355 (Bankr. M.D. Pa. 2013); *In re Bishop,* 296 B.R. 890, 895 (Bankr.S.D.Ga.2003) (decided under former § 362(h); *Fleet Mortg. Group, Inc. v. Kaneb,* 196 F.3d 265, 269 (1st Cir.1999) (decided under former § 362(h)).

Zokaites' first observation which was noted above is that Garth Lansaw testified that he didn't need to show evidence of causation.

In this case, there are substantial and insurmountable causation issues. Mrs. Lansaw admitted she experienced emotional distress because she had filed for bankruptcy. (*Id*. at A418). She admitted she had "long lasting stress as a result of her daughter and her arrest. (*Id*. at A428). She admitted that she has emotional distress as a result of attorney Don Calaiaro. (Exhibit 17). Exhibit 17 was an email from Mr. Lansaw to Calaiaro in which Mr. Lansaw admitted that "You have caused enormous stress and emotional damage to both my wife and I." She testified she experienced emotional distress when the sign was posted in 2005 which was pre-petition and long before any alleged stay violation. (*Id.* at A417).

She testified at one point that she sustained a closed head injury due to carbon monoxide poisoning that lasted two years, that killed two dogs and that caused her to have brain damage. She said she took medications and ultimately got to the point where did not need any medications. (*Id.* at A356-357). However, Mr. Lansaw testified that Mrs. Lansaw still has brain damage from the carbon monoxide poisoning even to this day. (*Id.* at 546).

Mr. Lansaw testified about an incident in 1997 in which he and his wife sustained carbon monoxide poisoning as a result of the incorrect installation of a furnace. He said that as a result of the poisoning, both he and his wife sustained

and continue to sustain brain damage to this day. (*Id.*). He also admitted that he is hyper vigilant because of carbon monoxide poisoning. He then claims that Zokaites' actions exacerbated the existing poisoning problems he and his wife have. He also claims that the poisoning prohibited him from doing executive functions and then again admits he is still suffering from the poisoning. Importantly, he claims that the poisoning started the change in his personality. (*Id.* at A529, 531-532).

Mr. Lansaw was shown Exhibit 18 which was a copy of a disability report that summarized his interview with a counselor. (Apparently he was collecting disability although he worked daily at the day care). This report was dated February 12, 2009, four years after the stay violations. The counselor notes him saying that "I haven't been the same since carbon monoxide poisoning back in the 1990s. Important and relevant excerpts from this report include:

> He indicated that he was diagnosed with executive functioning and personality change with apathy syndrome around 1994 but had been exposed to the carbon monoxide from October of 1992 until the end of December 1993…Results from this examination indicate functioning in the impaired range on three tests sensitive to the general condition of the brain that comprised Halstead Impairment Index. Deficits were consistent with residual, more localized cerebral dysfunction, most notably in the frontal bilateral hippocampal and perhaps temporal regions of the brain. In addition, personality testing indicated symptoms consistent with residual effects of carbon monoxide exposure including ongoing problems with fatigue, sleep disturbance, shortness of breath, tingling and numbness, muscle weakness, ringing in the ears and decreased libido.

> He indicated that his daughter and he have a difficult relationship…The difficult relationship with his daughter has caused great distress for him and he became tearful when describing it. Mr. Lansaw's mother is alive…but he does not speak with her and he stated he never knew his father.

Mr. Lansaw thus admits he has emotional distress from the poisoning and that he has great distress as a result of his poor relationship with his daughter that started well before the alleged stay violations. Additionally, and contrary to his testimony that he has been working on and off all the time, his statements to the disability counselor were contrary where he said he last worked as a financial planner in 1997 and hasn't worked since the carbon monoxide poisoning. (*Id.* at A26-27; Exhibit 18). Mr. Lansaw told the disability psychologist that his 78 year old mother was alive but that he does not speak to her at all and that he never knew his father.

Mr. Lansaw was shown a series of emails between him and attorney Calaiaro. One of the emails was discussed above with regard to Mrs. Lansaw in which Mr. Lansaw tells Calaiaro that Calaiaro has caused him "enormous stress and emotional damage." Mr. Lansaw goes on to write that "I'm so sick of this I could vomit." These admissions were denied by Mr. Lansaw when he denied Calaiaro's handling of case caused him emotional distress. He made this denial *before* he was shown the emails. (Id. at A541; Exhibit 17). Importantly, in an email from Calaiaro to Mr. Lansaw, Calaiaro outright tells Mr. Lansaw that he has lied

about any Menchyk loss and has lied about any loss of business income. (Exhibit 17).

As detailed above, both Mr. and Mrs Lansaw admitted they had brain damage from the carbon monoxide poisoning and that they still have brain damage today. Who's to say that isn't why they have emotional distress. They both testified they have significant distress from their daughter for being arrested for drug sales at the day care. Absent medical testimony, how do we know that isn't the cause of their distress? They testified they have emotional distress from filing bankruptcy. Again absent medical testimony, we don't know the cause of their distress. They testified they both have emotional distress from attorney Calaiaro. Again absent medical testimony how do we know the cause of their claimed distress now?

Mrs. Lansaw testified she has an ulcer caused by stress and not by bacteria. How do we know that absent medical testimony? She testified that she has an ulcer but the cause of the ulcer, stress vs. bacteria, requires medical testimony. Indeed, how do we know whether stress causes an ulcer at all and whether Mrs. Lansaw even has an ulcer absent medical testimony? We don't know that this alleged ulcer was caused by Zokaites. Indeed, we don't know if she even has an ulcer. This concern is exacerbated by her failure to simply reach into her purse and pull out a prescription bottle showing she takes medication for an ulcer or for depression or for anything. Similarly, why didn't she bring in a receipt showing she purchased

medication? Was that so much to do after taking medications for nine years? The Supreme Court says that she should have. Indeed, even if she pulled out a pill bottle, how do we know those pills are for ulcers and not for a headache? We know nothing.

Mrs. Lansaw testified she has depression but yet she also testified she has never seen a psychiatrist ever including the nine years she has had depression. Not seeing a psychiatrist for the severity of depression Mrs. Lansaw wants this Court to buy in to is simply not the least bit credible. How do we know she even has depression when her only doctor was a doctor who works at an Urgent Care that prescribed her medication. How do we know she even takes medication for depression when she produced not one receipt and, like the alleged medications for the ulcer, her failure to reach into her purse to pull out a prescription bottle showing she even takes medication for depression. How do we know causation and whether this alleged depression is from Zokaites or from her dog passing away or whether it is feigned like the Restatement of Torts talks about.

Mrs. Lansaw introduced not one shred of evidence to support the finding of anything. No matter how sympathetic one may feel for Mrs. Lansaw, her testimony is simply not credible, is legally and factually woefully inadequate, is unsupported and fails. No damages can be awarded to her. She provided not one shred of proof to establish causation.

As for Mr. Lansaw, absent medical testimony, how do we know what the symptoms means in the disability report and whether they are the source of his claimed distress. Particularly, the disability report said he had "Halstead Impairment Index". What does this mean? The disability report said his "deficits were consistent with residual more localized cerebral dysfunction, most notably in the frontal bilateral hippocampal and perhaps temporal regions of the brain". Again what does this mean and how, if at all, does this impact his claim to have emotional distress? Again, there was an abject failure of evidence to establish causation.

Compounding the above issues is the fact that both of the Lansaws testified they experienced emotional distress as a result of the sign and as a result of Zokaites throwing chains. Both of these incidents occurred in 2005 which was before the bankruptcy was filed and before the alleged stay violations. How do we know if their claimed distress was a result of the sign as they have claimed and not from the stay absent extrinsic evidence.

Absent extrinsic evidence of causation, the Court cannot possibly make any factual determination as to the source of the claimed emotional distress and whether it was a result of the stay violations or it occurred before. Similarly, absent extrinsic causation testimony, the Court cannot factually distinguish whether the emotional distress was caused by their failing in business and filing bankruptcy,

Zokaites, Calaiaro, both, a third party, the undersigned, or most likely doesn't even exist.

The point of all this is that absent extrinsic evidence linking the claimed distress to the alleged wrongful conduct or causation, no one can make any factual determination as to the cause of the distress whether it even exists. It is this failure why Judge Agresi erred as a matter of law and the award must be reversed.

It is not unreasonable to assume that the Lansaws experienced some distress for a period of time such as a week. Anyone would be upset over the chain incident and distress can be inferred just as Judge Deller said. However when the claim is for a period of nine years, it is not believable and extrinsic evidence thus becomes essential.

The only conclusion to be drawn is the fact that the Lansaws failed to provide any credible proof showing they sustained any emotional distress and similarly failed to demonstrate that even if they have distress, whether it is from the actions of Zokaites, third party circumstance or a combination of both.

As for Judge Agresti, he too as he had to, admitted that the Lansaws had proof problems in linking the damages to Zokaites. Judge Agresti's solution was to "temper its damage award". (Appendix, A169; DDE 218, pg. 19). Indeed, he went on to note admit that:

The Court is thus faced with a circumstance wherein it is convinced that the stay violations have caused emotional distress to the Lansaws but so have other factors. Moreover, the Court knows of no way to 'unbundle' the causative factors and assign specific harm to a specific cause. No testimony, expert or otherwise, was presented in an attempt to do that, and even if it had been, the Court doubts it could have been credible. One solution would be to ignore the other causes and award damages based on the full scope of the Lansaws' emotional distress; another would be to award no damages at all for emotional distress. The Court rejects both of those approaches. It will instead award damages, but suitably "discounted" to reflect as best as it can the causative role played by the other, non-compensable factors.

Judge Agresti plainly erred. The answer was that the Lansaws were required to introduce extrinsic evidence, preferably expert medical testimony, of their claimed injuries and causation. The Supreme Court requires it and said that it would not have taken much to introduce such evidence. Indeed, would it have been so much for the Lansaws to have introduced a medical bill, a pharmacy receipt, or have brought in even one witness? They didn't and what judge Agresti did was simply made up the entire damage award because of his belief in the egregious nature of the violations. What he did was improper and erroneous. Indeed, and as detailed below, his entire award is nothing more than improper speculation that is lacking in any legitimate factual support and he must be reversed.

Judge Agresti's solution to "temper" and "discount" the award is an abject failure. He never should have made any award for the Lansaws due to their evidentiary failures. He might not have liked doing that but he has now done what

Judge Posner was afraid of in *Aiello* which is Judge Agresti has now opened the floodgates for frivolous, fraudulent emotional distress claims. And this is exponentially exasperated by the fact that the Lansaws' claimed distress has now stretched on for nine years. Certainly if there ever was a case for expert medical testimony to show damages and causation, this is the case. For the many reasons, the award must be reversed.

(4)     The damage award was improper
         <u>because it was entirely speculative.</u>

 The law is well settled that damages must be proved with reasonable certainty and that mere speculation, guess, or conjecture will not suffice. The burden of proof on the issue of actual damages is on the debtor. *In re Iskric*, *supra.* Actual damages under § 362(k) must be proven with reasonable certainty. *In re Nixon,* 419 B.R. 281, 291 (Bankr.E.D.Pa.2009); *see also Dean v. Carr (In re Dean),* 2012 WL 4634291 at *5 (Bankr. M.D. Pa. 2012) (actual damages under § 362(k) must be proven by a debtor based upon concrete evidence of a definite amount).

The entire evidence in this case is speculative. Lansaws offered no proof of anything. Indeed, they didn't introduce one medical record, one prescription, or one receipt. They called not one witness other than themselves.

Judge Agresti said that because of the proof problems concerning causation that he could not ignore, he would "temper" and "discount" the award. No, that is completely erroneous and is nothing more than sheer speculation on his part that is reversible error. Judge Agresti was required to make a finding based on the facts and evidence introduced by the Lansaws. It was plain error for him to "temper" an award because he wanted to make an award for the Lansaws. And as detailed below, once he "tempered" and "discounted" the award, Judge Agresti proceeded to magnify it by a factor of five when he awarded punitive damages. Indeed, the simple analysis of this case is that the award is made up, speculative and built upon improper guess and speculation. Judge Agresti's award is erroneous speculation and must be reversed.

C.    Punitive Damages.

Judge Agresti awarded Lansaws punitive damages equal to approximately five times the amount of compensatory damages he awarded them. For the reasons detailed below, such an awarded was erroneous as a matter of law and fact.

The primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the creditor's behavior and the prospect for change is relevant to the amount of punitive damages to be awarded. *In re Shade*, 261 B.R. 213, 216 (Bankr.C.D. Ill.2001).

Punitive damages are within the discretion of the Court with one court stating that punitive damages should be awarded with respect to conduct which is tantamount to a "cavalier disregard for the automatic stay". *In re Smith*, 170 B.R. 111, 118 (Bankr. N.D. Ohio 1994); *In re Radcliffe*, 372 B.R. 401 (Bankr. N.D. Ind. 2007).

A bankruptcy court considers four factors in determining whether to impose punitive damages for a stay violation: (1) the nature of creditor's conduct; (2) the creditor's ability to pay damages; (3) the creditor's motives; and (4) any provocation by the debtor. *In re GGSI Liquidation Inc.*, 351 B.R. 529 (Bankr. N.D. Ill. 2006).

While not argued in depth in this appeal, Zokaites would like to point out to the Court two matters concerning the alleged stay violations. First, the chaining of the doors has been overblown. The chains were put up on a Sunday and were only there after being told to do so by counsel but Lansaws had gained access for two hours and the testimony of Zokaites was that he intended to remove them and that he put them on because the Lansaws were taking all the personal property to the new leased space absent an order of court. Zokaites was concerned that the assets would simply disappear just as what has happened now with the closure of the day care.

Secondly, Zokaites went to the Lansaws premises to photograph the collateral with his counsel on the advice of counsel. Zokaites does not believe he should be sanctioned for having relied upon legal advice. Similarly, it was an improper conclusion that Zokaites violated the automatic stay by exercising his rights as a private citizen and filing exceptions to the zoning board of Pine Township concerning the new leased premises that was in violation of the building code. Finally, the letter and draft complaint to the new landlord was submitted by and based upon the legal advice and recommendation of counsel. This too should not have caused a stay violation against Zokaites for relying on advice of counsel.

(1)    The first issue is that such an award was unnecessary as a deterrence to Zokaites since Judge Fitzgerald lifted the injunction against him more than eight years <u>prior to the 2014 proceedings.</u>

It is well settled that the purpose of imposing punitive damages is not compensatory but rather a deterrence of future, bad conduct. *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1 (1991). In the case at bar, there was simply no evidence of any future bad conduct to deter. The evidence was undisputed that Zokaites has taken no action against the Lansaws and has no contact with them for over nine years. Quite obviously and by their own admissions, because it has been nine years, nothing remains to deter any wrongful conduct of Zokaites. Equally telling is that Judge Fitzgerald lifted the injunction shortly after she imposed it because she correctly believed there would be no further improper conduct on Zokaites'

part.

Additionally, Judge Fitzgerald's ruling allowing the Lansaws' to break the Zokaites lease with the consequent loss of hundreds of thousands of dollars in lost rent was a sufficient penalty for Zokaites or for anyone for that matter. It was error for the Court to impose punitive damages. In fact, the Court made no finding that deterrence was necessary. The only finding that even comes close to this factor is as follows:

> Furthermore, he violated the automatic stay on multiple occasions and in all likelihood would have continued to do so had the Lansaws not filed an adversary proceeding seeking injunctive relief on August 28, 2006 and obtained a TRO a few days later. Zokaites' actions were those of a person who thinks he can disregard the requirements of the law with impunity.

(Appendix, A83; DDE 218-2).

In making this finding, Judge Agresti completely ignored the fact that Judge Fitzgerald quickly lifted the injunction and no further actions were taken by Zokaites. This finding is also peculiar in light of the fact that Zokaites did obey the Court's restraining order and there were no further incidents for the next nine years.

(2)	The next issue is whether Judge Agresti erred in awarding
	punitive damages when the Lansaws failed to introduce
	any evidence of the financial wherewithal of Zokaites and
	whether he could afford and pay or not pay for such an award.
	In addition, Judge Agresti erred
	in extracting or inferring evidence on his own accord of Zokaites'
	financial wherewithal and such inferences were entirely
	speculative and erroneous as he relied on nine year
	<u>old general background testimony.</u>

The second factor that a Bankruptcy Court must consider in awarding punitive damages is the creditor's ability to pay damages.

In the case at bar, the Lansaws failed to introduce one shred of evidence concerning Zokaites' ability to pay the punitive damage claim. The Lansaws didn't even ask Zokaites any questions about his financial wherewithal and further failed to engage in any discovery concerning this nor did they introduce any evidence of his finances or lack thereof.

Judge Agresti, recognized the Lansaws' failures and said:

> The final factor is the ability of Zokaites to pay a punitive damage award. There was little evidence presented at this point at the August trial, which the Court believes may be largely attributable to the fact that the Lansaws were acting *pro se* and were likely unaware of the need to provide such evidence….

(Appendix, A84; DDE 218-2).

Judge Agresti then, however, on his own went on to rely upon Judge Fitzgerald's Trial Notes she had taken nine years' before in the 2006 trial in which she made passing comment to his business activities at that time. (DE 218-2, R A

85). Such reliance is misplaced as the description in the Court's Opinion is nothing more than an incomplete snapshot of Zokaites' business activities in 2006. Equally egregious is the failure to identify what Zokaites was carrying in 2006 and what occurred in his finances during the next nine years. Simply put, Judge Fitzgerald's comments were nothing more than typical background information of a witness given at a trial and was far from probative of his financial worth. This factor was therefore not met.

(3)    The third issue is that Judge Agresti erred in relying
       on the factors he did in awarding punitive damages.

The Third Circuit in the case of *CGB Occupational Therapy, Inc. v. RHA Health Services, Inc.*, 499 F.3d (3rd Cir. 2007) had occasion to analyze the process in determining how a court should compute punitive damages. The Third Circuit stated that courts must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (citing *BMW of North America v. Gore*, 517 U.S. 559, 575 (1996)).

The Supreme Court has stated that the degree of reprehensibility of the defendant's conduct is "[t]he most important indicium of the reasonableness of a punitive damages award." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.

408, 419 (2003) (quoting <u>Gore,</u> 517 U.S. at 575, 116 S.Ct. 1589). Factors looked to in determining reprehensibility include: "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident [continued pattern of ignoring court orders]; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *CGB Occupational Therapy, Inc, supra*. In *Gore,* the Supreme Court went on to say that "[e]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful" is highly indicative of reprehensibility. *Gore,* 517 U.S. at 576, 116 S.Ct. 1589.

In *State Farm,* the Supreme Court further held that:

> …Our jurisprudence and the principles it has now established demonstrate, however that in practice, few awards exceeding a single digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, *we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety*. 499 U.S. at 23-24, 111 S.Ct. 1032…The Court further referenced a long legislative history dating back over 700 years and going forward to today, providing for sanctions of double, treble or quadruple damages to deter and punish.

(emphasis added); 538 U.S. at 420.

The Third Circuit went on to state that "[t]he second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award

is its ratio to the actual harm inflicted on the plaintiff." (citing *Gore*, 517 U.S. at 580, 116 S.Ct. 1589). The Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio," instead emphasizing that "[t]he precise award in any case ... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Campbell*, 538 U.S. at 424–425.

The final factor looked to is the wealth of the reprehensible defendant. A court looks to the defendant's financial strength recognizing that what "may be awesome punishment for an impecunious individual defendant ... [may be] wholly insufficient to influence the behavior of a prosperous corporation." *Continental Tred Resources, Inc. v. OXY USA Inc.,* 101 F.3d 634, 641 (1996);

Wealth is also relevant because "[a] rich defendant may act oppressively and force or prolong litigation simply because it can afford to do so and a plaintiff may not be able to bear the costs and the delay." *Id.* at 642; *accord Mathias v. Accor Economy Lodging, Inc.,* 347 F.3d 672, 677 (7th Cir. 2003).

In the case at bar, Zokaites submits that punitive damages were erroneously awarded because there was no evidence that deterrence was necessary. Further, the Lansaws sustained no physical harm nor did they sustain any losses to their business. Moreover and importantly is the fact that Zokaites' conduct did not involve repeated actions in which he repeatedly ignored court orders. Indeed, the opposite was true. After Judge Fitzgerald held that the incidents in question

violated the automatic stay, entered an injunction against Zokaites and allowed the Lansaws to move the leased premises and terminate their lease with Zokaites, Zokaites did not engage in any further conduct involving the automatic stay or with Lansaws at all for the next nine years and this is true as of today. In fact, merely a few months later, Judge Fitzgerald dissolved the injunction she issued against Zokaites.

Furthermore, should this Court disagree with the analysis concerning the Lansaws' abject failure to prove any actual damages, then an award of compensatory damages mitigate against a further award of punitive damages. In *State Farm, supra*., a Utah court awarded the plaintiffs $1.0 million in compensatory damages and $145 million in punitive damages in an insurance bad faith action. The Supreme Court struck down the punitive damage claim and said:

> The compensatory damages for the injury suffered here moreover likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the hands of their insurer and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. See the Restatement (Second) Torts, § 908, Comment c, p. 466 (1977). ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

*State Farm, supra* at 420.

To conclude, there is no basis for the award of any punitive damages. Indeed, any award for punitive damages when there is no need for deterrence anymore would be compensatory to the Lansaws and illegal and violative of *State Farm* and Zokaites' due process rights.

(4)     The fourth issue is that Judge Agresti improperly
        allowed the testimony of attorney Donald Calaiaro and
        whether he used such testimony to support his conclusion
        <u>as to one of the factors for punitive damages.</u>

In its attempt to find that the Lansaws had proven element three set forth above, motive, Judge Agresti said that "Zokaites engaged in what might colloquially be referred to as 'scorched earth' tactics in the Lansaw bankruptcy." (Appendix, A 83; DDE 218-2). This statement was made without any support in the record. In fact, none of Zokaites' "scorched earth" tactics resulted in any Rule 11 or other sanctions. Rather, all Zokaites did in the proceedings was to protect his lease and to aggressively defend himself against punitive damage claims.

Instead, the Court relied upon the testimony of Donald Calaiaro, Esquire as follows:

>       At a fee petition hearing held before Judge Fitzgerald in 2011,
>       the Lansaws' former bankruptcy attorney, one of the most
>       experienced bankruptcy practitioners in this District, testified
>       that Zokaites was not litigating for money, but rather for
>       'sport'….

(DE 218-2, R. A 83).

This reliance is misplaced for two reasons. First, Zokaites was not present at that fee petition hearing and in fact, it did not involve him. Mr. Calaiaro's testimony was not subject to Mr. Zokaites' cross examination. Second, Mr. Calaiaro's opinion that Mr. Zokaites was not litigating for money, but for "sport" is completely irrelevant to these proceedings.

The Court placed further reliance upon Mr. Calaiaro's testimony and opinions as follows:

> …The Lansaws called this attorney as a witness at the August trial and asked him about that characterization. While the attorney did not use the same colorful terminology in his trial testimony, in substance, he said much the same thing: 'My recollection from what I can remember right now is that throughout the litigation Mr. Zokaites filed objections to everything we did. I did not believe some of the objections were well founded, and it appeared to me that we were litigating everything and anything in the case.'

(DE 218-2, R A 84).

As stated previously, Mr. Calaiaro's opinion in this regard is completely irrelevant. It should also be noted that Zokaites' "scorched earth" and "litigation for sport" tactics resulted in the non-suit dismissal of all the state tort claims.

D.    Judge Agresti erred in denying Zokaites' Offer
      of Judgment when the Lansaws recovered an
      award of zero on their state law claim
      compared to Zokaites' offer of $25,000.

On October 4, 2013, Zokaites made and filed an "offer of judgment" pursuant to Rule 68 made applicable by Fed.R.Bankr.P. 7068. [63]. Zokaites' offer

of judgment was actually two offers of judgment mirroring the Lansaws' two separate claims of false light and the automatic stay violation.

Paragraph 9 of Zokaites' Offer of Judgment delineated his two offers as follows:

> 9.     In accordance with Fed. R. Civ. P. 68, Zokaites makes the following offer of judgment:
>
> (a)     <u>Automatic Stay Violation.</u>  The sum of $2,862 for actual damages as claimed by debtors plus 5 times this amount for punitive damages or $17,172.
>
> (b)     <u>False Light/Invasion of Privacy.</u>  The sum of $25,000 representing actual and punitive damages.

In Paragraph 10 of his Offer of Judgment, Zokaites totaled the two individual offers which totaled $42,172. Additionally, Zokaites stated that the two offers of judgment were to be offset against what the Lansaws owed him. This offset language mirrored Lansaws' assertions in their Objection to Claim at Paragraphs 17 (relating to the stay violations) and 20 (relating to the false light claim) in which they state that:

> 17.     The Claimant's [Zokaites] claim should be reduced by the amount of the attorney's fees and costs incurred by the Claimant's violation of the automatic stay. Moreover, the reduction should not be a dollar-for-dollar reduction in the amount of any allowed claim, but rather should be a dollar-for-dollar reduction of the amount due to Claimant under a confirmed Chapter 13 Plan.[4]

---

[4] Lansaws' claim for the stay violation included attorney's fees, costs and punitive damages. *See* Objection, ¶¶ 15-16.

20. To the extent that Debtors prevail in that action, the Debtors would be entitled to a further reduction of the Claim of Zokaites.

(Appendix, A 40-41; DDE 1, pg. 4-5).

During trial, Judge Agresti granted Zokaites' motion for a non-suit on the Lansaws' false light claim. (Appendix, A 613-614).

Judge Agresti denied Zokaites' Offer of Judgment apparently not understanding that it was comprised of two separate offers in conjunction with the Lansaws' two separate claims. In flatly denying the overall offer of judgment[5], Judge Agresti tersely wrote:

> … the Court reviewed it and determined that the amount offered by Zokaites was less than the amount of the award (only $42,172), therefore the condition to trigger *Rule 68* was not met. Furthermore, Zokaites' offer of judgment specified that his offer was to be set off against his unpaid claim, which made his "real" offer $0. One might have thought that Zokaites would have proposed an offer of the full amount of his claim, knowing that he was never going to recover anything on it anyway. The fact that he did not do so provides an interesting insight into his mindset and, in the Court's view, further confirms its assessments concerning his motives, as previously discussed.

(Appendix, pg. A 91; DDE 218, pg 41, footnote 14).

Rule 68 provides that:

---

[5] Judge Agresti denied Zokaites' Offer of Judgment on the last page of his memorandum opinion in footnote 14. (Appendix, pg. A 91; DDE 218, pg 41, footnote 14).

(a)    Making an Offer; Judgment on an Accepted Offer. At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 14 days after being served, the opposing party serves written notice accepting the offer, either party may then file the offer and notice of acceptance, plus proof of service. The clerk must then enter judgment.

(b)    Unaccepted Offer. An unaccepted offer is considered withdrawn, but it does not preclude a later offer. Evidence of an unaccepted offer is not admissible except in a proceeding to determine costs.

(c)    Offer After Liability Is Determined. When one party's liability to another has been determined but the extent of liability remains to be determined by further proceedings, the party held liable may make an offer of judgment. It must be served within a reasonable time--but at least 14 days--before the date set for a hearing to determine the extent of liability.

(d)    Paying Costs After an Unaccepted Offer. *If the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made*.

(emphasis added).

In this case, Zokaites offered the Lansaws $25,000 to settle their false light invasion of privacy claim. Lansaws did not accept Zokaites' offer and recovered zero on their claim. Under Rule 68(b), the Lansaws are therefore obligated to pay Zokaites his costs and attorney's fees incurred after he made this offer under Rule

68 and this matter must be remanded back to Judge Agresti for a determination of Zokaites' costs and attorney's fees he incurred after the offer was made.

Judge Agresti erred in denying Zokaites' offer because he aggregated the two offers into one offer of $42,172. This was error as that it not what Zokaites offered as evidenced by Paragraph 9 of the Offer Motion. Indeed, Judge Agresti simply ignored the two specific subparagraphs that constituted two separate offers in this paragraph 9. Further still, Judge Agresti failed to explain why he did not take the specific offers/subparagraphs in paragraph 9 into account in ignoring them and simply aggregating them. Further still, and as it turned out in Judge Agresti's opinion relating to an offset of the Lansaws' claim against the Zokaites claim under Section 553(a), it is not possible to collapse the two separate offers into one because they false light claim is subject to an offset under Section 553(a) but the automatic stay is not, just as Judge Agresti ruled.[6] Therefore, he committed error in granting the Rule 68 offer of judgment as to the false light claim.

As Rule 68 provides, the Lansaws are therefore obligated to pay Zokaites his costs and fees incurred after he made the offer of judgment.

---

[6] In this footnote 14, Judge Agresti falsely assumed that Zokaites should have offered the Lansaws the full amount of his claim because he knew "that he was never going to recover anything on it anyway." This is false. At the time Zokaites made the offer, he did not know that the Lansaws, unilaterally and without any disclosure in their bankruptcy, had closed their business and sold all of their assets.

As a footnote to this matter, Judge Agresti's extraneous commentary at the end of the footnote attacking Zokaites is inappropriate and is a further demonstration of his loss of objectivity in this matter as it relates to Zokaites.

E.     To the extent it was appropriate to award
       Lansaws any damages, Judge Agresti erred
       as a matter of law in failing to rule that any award
       for Lansaws constituted property of the estate.

11 U.S.C. § 541(a) provides that upon the commencement of a petition in bankruptcy, an "estate" is created the is comprised of all of the following property, wherever located and by whomever held including under Section 541(a)(7) "Any interest in property that the estate acquires after the commencement of the case."

The enactment of the BAPCPA expanded the definition of "property of the estate" under Section 1115 from "all property and interest owned by the debtor as of the commencement of the bankruptcy" to "in a case in which the debtor is an individual, property of the estate includes, in addition to the property specified un Section 541, all property of the kind specified in Section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted…

Similarly, Section 1306(a) defines "property of the estate" as all "earnings and other property acquired by the debtor following commencement of the case but before the case is closed, dismissed or converted."

Estate property continues until the debtor is granted a discharge. Section 727.

In this case, the Lansaw bankruptcy started out as a Chapter 13 on August 16, 2006 and was converted to Chapter 7 on November 10, 2011. As of the date of this Brief, the Lansaws have not been granted a discharge and the estate is still in existence.

Zokaites has prepetition claims of $72,696.93 as a secured claim and $116,702.15 as an unsecured claim totaling $189,399.08. Further, Zokaites has an administrative claim of $58,433.98. Any award on the stay violations which is post petition must be offset against the administrative claim which was also incurred post petition.

At trial and in its memorandum opinion, Judge Agresti failed to address this issue at all.

Based on the above, the award constitutes property of the estate and any ultimate recovery after Zokaites' offset for his administrative claims must flow into the estate for the benefit of the Lansaws' creditors including Zokaites whom is owed $247,833.06 by the Lansaws.

## VI.    <u>Conclusion:</u>

To summarize, even if the Court is to adopt the "egregious standard" enunciated in *Dawson, Dawson* simply cannot be applied in a case such as this.

*Dawson* theoretically works in the case of a stay violation coupled with a short lived claim for emotional distress. In such a case, and if the violation is egregious, it could be argued that it is reasonable for a court to infer that emotional distress occurred because of the conduct was extreme and outrageous. Thus, that extrinsic evidence to prove the emotional distress would not be necessary.

The case at bar, however, is far, far different. Here, the Lansaws are claiming they have been *permanently injured* by the stay violations and claim they are still in distress nine years later. Such a claim is not credible absent extrinsic proof of such distress. As the Supreme Court has noted, what extra effort would it take to introduce extrinsic evidence such as a doctor's testimony or even a medical bill or receipt. Such evidence is required in all other cases, why shouldn't it similarly be required in the case of a claim of long term emotional distress as in this case. This is particularly so when everyone recognizes the ease with which such claims can be manufactured.

Here, Lansaws were well aware for years that extrinsic evidence to prove their claim for long term emotional distress would be an issue. They knew this through the extensive written discovery, through questioning in depositions, and in various pleadings filed with the court. (Indeed, Zokaites' motion and supplemental motions for summary judgment raised these very issues). Instead of taking heed and having a doctor vouch for their claims, they chose to ignore these essential

evidentiary issues. If the Court were to allow their award to stand absent extrinsic evidence, it opens the floodgates for fraud and manufactured claims.

Beyond the above, the Lansaws simply did not introduce any evidence of causation with Garth Lansaw boldly saying they didn't have to. Similarly, and as detailed above, there are so many intervening and superseding factors that make their claim strictly against Zokaites unbelievable. Although Judge Agresti was sympathetic to the pro se Lansaws, they must be subject to the rules and law just like Zokaites.

The award of punitive damages is also troubling. Judge Agresti made up or speculated to the amount of compensatory damages which he said would be "tempered". Instead of tempering his award, he then proceeded to magnify it five-fold with the punitive damages. Indeed, the pro se Lansaws didn't ask Zokaites any questions about his finances nor did they engage in any discovery concerning this. Unfortunately, Judge Agresti stepped in after the trial was concluded and attempted to help the pro se Lansaws by digging up stale, nine year old background testimony.

For all of the above reasons, the award in this case must be reversed.

Respectfully submitted,

/s/ Jeffrey A. Hulton, Esquire
Jeffrey A. Hulton, Esquire
PA ID No. 49522

429 Fourth Avenue, Suite 1201
Pittsburgh, PA 15219
(412) 586-5592
jhulton@hultonlaw.com

Counsel for Appellant,
Frank R. Zokaites

Dated: June 30, 2015

## VII. <u>Request for Oral Argument:</u>

In accordance with Rule 8019, Zokaites hereby requests oral argument in support of his Brief. Zokaites believes that oral argument will narrow the focus of the issues on appeal and aid the Court in rendering its decision.

Respectfully submitted,

<u>/s/ Jeffrey A. Hulton, Esquire</u>
Jeffrey A. Hulton, Esquire
PA ID No. 49522

429 Fourth Avenue, Suite 1201
Pittsburgh, PA 15219
(412) 586-5592
jhulton@hultonlaw.com

Counsel for Appellant,
Frank R. Zokaites

Dated: June 30, 2015

# VIII. CERTIFICATION:

1.    This Brief complies with the type-volume limitation of Rule 8015(a)(7)(B) or 8016(d)(2) because:

x    this Brief contains <u>17,868</u> words, excluding the parts of the Brief exempted by Rule 8015(a)(7)(B)(iii) or 8016(d)(2)(D). Attached is evidence of said word count obtained from Microsoft Word.

Dated: June 30, 2015        <u>/s/ Jeffrey A. Hulton, Esquire</u>
Jeffrey A. Hulton, Esquire
PA ID No. 49522

429 Fourth Avenue, Suite 1201
Pittsburgh, PA 15219
(412) 586-5592
jhulton@hultonlaw.com

Counsel for Appellant,
Frank R. Zokaites

**<u>CERTIFICATE OF SERVICE:</u>**

I hereby certify that a true and correct copy of Appellant's Brief was served

on Garth and Deborah Lansaw by US Mail, postage prepaid this 30th day of June,

2015 as follows:

Garth and Deborah Lansaw
2353 Fairhill Road
Sewickley, PA 15143


<u>/s/ Jeffrey A. Hulton, Esquire</u>
