UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

GARTH AND DEBORAH LANSAW,
          Appellees,

vs.                                          CASE NUMBER 15-0404-DSC

FRANK ZOKAITES,
          Appellant.

---

Appeal by Frank Zokaites from the Order of Court by the Honorable Thomas P. Agresti,
Judge, of the United States Bankruptcy Court for the Western District of Pennsylvania,
Dated January 14, 2015 Entering Judgment in Favor of Garth and Deborah Lansaw and
Against Frank Zokaites in the Amount of $50,100.

---

## RESPONSE BRIEF FOR THE APPELLEES

Garth F. Lansaw

*[signature]*

Deborah L. Lansaw

*[signature]*

Appellees, *pro se*


2353 Fairhill Road

Sewickley, Pa. 15143

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

GARTH AND DEBORAH LANSAW,
                    Appellees,

vs.                                             CASE NUMBER 15-0404-DSC

FRANK ZOKAITES,
                    Appellant.

## RESPONSE BRIEF FOR THE APPELLEES

In accordance with rules put forth by the Honorable Judge David Cercone,

Appellees response has been limited to 25 pages. Considering the Appellants Brief was

in excess of 60 pages, it appears this is in direct violation of the requirements of the

Court to limit the contents of a brief to 25 pages. The Appellees have dramatically

reduced their brief in order to comply with the rules. Appellees respectfully request that

since this rule was violated and the content exceeded 100% of the allowable pages, that

the Appellant's brief be rejected by the Court and not be permitted to be considered in

this Appeal.

## JURISDICTION AND STANDARD OF REVIEW

Federal district courts have appellate jurisdiction over the final judgments, orders,

and decrees of the bankruptcy court. 28 U.S.C. § 158(a)(1). Rule 8013 of the Federal

Rules of Bankruptcy Procedure provides:

> On an appeal the district court or bankruptcy appellate panel may affirm,
> modify, or reverse a bankruptcy judge's judgment, order, or decree or
> remand with instructions for further proceedings. Findings of fact, whether

based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the Bankruptcy Court to judge the credibility of the witnesses.

Judge Thomas Agresti inherited this case when Judge Fitzgerald retired. He has clearly stated that Judge Fitzgerald's findings of fact in her court would be the platform on which the final court issues would be guided by. Judge Agresti cannot and did not alter, usurp or ignore the findings of Judge Fitzgerald. Judge Agresti has made a seamless segue into this case.

Judge Agresti was the sole trier of fact. His determination of credibility and his following of the law of the case decided the damages. As required, and as clearly stated in Iskric, Judge Agresti became the receptacle of prior docketed case entries. It is well settled that a bankruptcy judge may take judicial notice of his or her own docket entries. *Mar. Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n. 3 (3d Cir. 1991); *Steinmen v. Spencer*, (*In re Argus Group 1700, Inc.*), 206 B.R. 737, 741 n. 8 (Bankr. E.D. Pa. 1996).

## RESPONSE TO APPELLANT ZOKAITES' ISSUES

**Res Judicata:**

Res Judicata is not a valid issue in this appeal as the very first paragraph of Judge Fitzgerald's opinion states that the issues at bench were injunctive relief to stop Mr. Zokaites from continued violations of the Automatic Stay and to prohibit him from interfering with the Debtors business. Inclusive of these requests was the seeking of an order to permit rejection of the lease. Mr. Zokaites did not make any argument related to False Light or the Automatic Stay violations. In the last paragraph of Judge Fitzgerald's opinion, she states that Mr. Zokaites, when he learned that Debtors were successful in

their requests for the above issues, requested that the decision be stayed pending appeal. This was rejected by Judge Fitzgerald. Mr. Zokaites did not appeal this trial verdict, or any content of Judge Fitzgerald's Opinion. As such, the Opinion is the ruling law of the case.

The Opinion does not state, insinuate or leave any doubt that the topic of damages was not related to the two day trial held in October of 2006. There is no statement in the opinion that would or could lead any person to conclude Judge Fitzgerald refused to award any damages related to the Automatic Stay violation.

Also related to Res Judicata. Repeatedly Zokaites fails to understand that if Judge Fitzgerald had not retired, she simply would have had him understand that what was occurring was the damages phase of the prior trial. There is no evidence provided by Zokaites that damages were testified to, argued for, presented in pretrial communications or numerically calculated. No damages evidence was placed on the record related to False Light, no expert report was submitted, nothing. Again, this relates to the 2006 trial.

Since Zokaites has failed to support any of his presumptions, accusations and/or beliefs of judicial error by providing this court with a transcript of the Trial which took place in 2006, nothing he argues that would require the need to read this transcript is valid.

Zokaites admits that he does not assert res judicata nor collateral estoppel related to the Motion of February 23, 2007. He states that defense must demonstrate that:

1) There has been a final judgement on the merits in a prior suit.

2) the prior suit involves the same parties or their privies and

3) the subsequent suit is based upon the same causes of action. United States v. Athlone Industries, Inc., 746 F.2d 977, 983 (3d Cir. 1984).

These three considerations all have a common denominator, which is the word SUIT. The trial in August 2014 was not a new suit. It was, as it was always intended to be, a hearing for damages for Stay Violations and the trial for False Light.

Res judicata is not designed to stop the stages of a trial, especially not to stop the damages phase. If this were to be a criminal trial, the guilty would walk free under the Zokaites method of justice.

**Emotional Distress Damages:**

Although related to an Abuse of Process claim, Cruz v. Princeton Insur. Co., 2009 Pa. Super 49; 2009 Pa. Super. LEXIS 64 (Mar. 24, 2009), ruled upon one of the elements, i.e. harm to the plaintiff, finding that the harm element could be met by merely using the plaintiffs' testimony. Furthermore the Honorable Eric J. Frank, United States Bankruptcy Judge for the Eastern District of Pennsylvania, authored an opinion supporting the notion that emotional distress damages may be awarded to a Debtor for a violation of the Discharge Order. See In Re Meyers, 344 B.R. 61, 66-67 (E.D. PA 2006). He opines that courts which have granted emotional distress damages as a remedy for contempt have consistently found the debtors own testimony to be enough and that no medical testimony was needed. Meyers at 67 referencing In re Feldmeier, 335 B.R. at 814-15 ($10,000 awarded to debtor for emotional distress without medical

testimony); *In re Barry*, 330 B.R. at 37 (awarding $5000 for emotional damages from debtor's testimony of stress and loss of sleep, but not for alleged diverticulitis absent testimony from medical professional); *In re Poole*, 242 B.R. at 112 (awarding $1,200 for emotional distress without medical testimony). See generally *In re Stewart*, 2000 WL 1194437 at *5 (Bankr.S.D.Ga. July 9, 2000) (quoting *In re Washington*, 172 B.R. 415, 427 (Bankr.S.D.Ga.1994)) (medical testimony is unnecessary but proof of mental anguish must be more than fleeting and inconsequential.)

In *Dawson v. Washington Mutual Bank (In re Dawson)*, 390 F.3d 1139 (9th Cir. 2004), the court found that an individual may establish significant emotional harm in a wide variety of ways: (1) corroborating medical evidence; (2) non-experts, such as family members, friends, or coworkers; (3) egregious conduct by the violator; or (4) even if the violation of the automatic stay was not egregious, the circumstances may make it obvious that a reasonable person would suffer significant emotional harm.

In The United States Bankruptcy Court Easter District of North Carolina Greenville Division In RE: Kraig Alan Long, Nancy Jo Long, Debtors Chapter 13 Case NO. 11-05070-8-RDD, upon finding willful violations of the automatic stay, the Court may award actual damages, which include monetary damages "to compensate for actual emotional distress caused by a creditor's violation of the automatic stay." " *In re Thorpe*, No. 11-00862-8-SWH, 2011 WL 5909403 at *2 (Bankr. E.D.N.C. May 17, 2011) (citing *In re Kirkbride*, Case No. 08-00120-8-JRL, 2010 WL 4809334 (Bankr. E.D.N.C. Nov. 19, 2010) (allowing $10,000.00 damages for humiliation and embarrassment caused by a creditor's actions).

In *Sternberg v. Johnson*, the 9th Circuit Court of Appeals, Case Nos. 07-16870 & 08-15721 October 1, 2009, said the $20,000 award for emotional distress was resolved in this opinion by a one-paragraph footnote stating that 1) the automatic stay violation need not necessarily be "egregious" to warrant an emotional distress award, and 2) the circumstances need only to "make it obvious 'that a reasonable person would [have] suffer[ed] significant emotional harm."

Zokaites arguing that the award of emotional damages need be reversed since his interpretation is that Judge Agresti's conclusion was "speculative" Lansaw quotes part of Judge Agresti's opinion:

> There is no "legal yardstick" by which to accurately measure reasonable compensation for injuries such as emotional distress. Spence v. Board of Education of Christine School District, 806 F.2d 1198, 1203 (3d Cir. 1986) (Higginbotham, J., concurring). Damages for emotional distress are by their very nature incapable of precision. Griffiths v. CIGNA, Corp., 857 F.Supp. 399, 409 (E.D. Pa. 1994).

Zokaites' argument fails in respect to the fact that his actions were found to be egregious. This cannot be argued simply because Zokaites chooses a different definition of his own behaviors. Zokaites does not enjoy the privilege of redefining egregious as concluded by Judge Agresti. The law does not permit personal interpretations for semantic variables.

Zokaites argues that appropriate time has passed since he backed Mrs. Lansaw against a door in the daycare and pushed to instigate a physical altercation that she should not be bothered by the memory. Zokaites finds his behavior would only cause "fleeting or trivial "emotional stress. Judge Fitzgerald found evidence significant enough

to place a restraining order on Mr. Zokaites, forbidding him to even enter his own property. This order was in force for 6 months until Lansaw vacated the premises and moved to a secure building in a nearby office park. When Zokaites chained the doors closed on our business, he placed an enormous unforgettable emotional burden that normal people find difficult to deal with and overcome. When he and his attorney, who now states that he instructed Zokaites to Violate the Automatic stay 3 different times, entered a daycare, and placed Mrs. Lansaw against a door, they both created an indelible impression of their capabilities as men against a woman protecting dozens of babies and toddlers. How does one simply forget this emotional assault? The world is filled with women who have been in similar positions and they have NEVER forgotten the event and have changed their way of life accordingly due to the event. Men do not forget men who assault their wives. And how does one reconcile an officer of the court not only attending, but now saying he instructed the event to occur. Zokaites gained Mrs. Lansaw's medical records in discovery. Had there been value, he would have hired an expert to argue those findings. Zokaites asked specifically by motion, to depose Mrs. Lansaw in regards to her medical issues. Judge Agresti did not deny this motion. Zokaites never scheduled the deposition.

Zokaites contends that without extrinsic evidence, there can be no damages. Clearly there will be times, for one reason or another, where extrinsic evidence will simply not exist. Does this permit the violator to escape the damages of his actions? The Courts have repeatedly concluded that when a Violation of the Automatic Stay is done with malice, disregard for Debtors mental and physical wellbeing along with other egregious behaviors, the test for emotional distress is met.

As Judge Agresti concluded in his opinion:

The post filing conduct of the Defendant ranks with the most egregious the Court has personally witnessed while on the Bench or even reviewed in its research when evaluating violations of the automatic stay. Frank Zokaites clearly knew what he was doing, believing at the time (and even at the August trial) that he was above the law and that the constraints of the automatic stay provisions of the Bankruptcy Code posed no impediment to him as he toyed with and harassed the Debtors as they pursued their fresh start in bankruptcy. Clearly this is a case where a financially capable bully, not just in the figurative but also the literal sense, arrogantly attempted to manipulate the system and intimidate the Debtors so he could collect the rent he believed was due even after the bankruptcy was filed.

Lansaw completely agrees with Judge Agresti's opinion on this matter and as such offers that opinion as additional argument against Zokaites' position.

**Punitive Damages:**

A bankruptcy court may award punitive damages for an automatic stay violation. The Third Circuit has noted that a bankruptcy court has the discretion to impose punitive damages in "appropriate circumstances." *Solfanelli v. Corestates Bank, N.A.,* 203 F.3d 197, 203 (3d Cir. 2000) (decided under former § 362(h)).

Punitive damages may be awarded against a defendant to punish him for outrageous conduct and to deter him, or others like him, from similar conduct in the future. Four factors are frequently considered when determining whether to award punitive damages and, if so, in what amount. Those factors include: (1) the defendant's conduct; (2) its motives; (3) any provocation by the debtor; and, (4) the defendant's

ability to pay. *In re Frankel*, 391 B.R. 266, 275 (Bankr. M.D. Pa. 2008) (internal citations omitted); *In re Patterson*, 263 B.R. 82, 97. (Bankr. E.D. Pa. 2001). The Court may also award punitive damages for a willful violation of the automatic stay for the purpose of causing "'a change in the creditor's behavior . . . .'" *In re Sands*, No. 10-12205C-13G, 2011 WL 3962491 at *3 (Bankr. M.D.N.C. April 1, 2011) (quoting *In re Shade*, 261 B.R. 213, 216 (Bankr. C.D. Ill. 2001)).

Zokaites argues that sufficient evidence relating to his personal wealth would be required of the court for any calculation of Punitive Damages. Several cases state that evidence of wealth is not necessary to assess Punitive Damages. *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984), the Pennsylvania Supreme Court interpreted the first sentence of section 908(2) of the Restatement (Second) of Torts, which, as noted above, states that "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Feld*, 485 A.2d at 747. In doing so, the Court did not consider wealth as a prerequisite to imposition of punitive damages but, rather, relied on, inter alia, the first sentence of section 908(2) to conclude that a "court should examine the actor's conduct" when deciding whether to impose punitive damages. *Id.* at 748. *See also SHV Coal*, 587 A.2d at 705 (examining evidence of the defendant's conduct, not its wealth, to conclude that the trial court did not abuse its discretion by determining that the defendant's conduct was outrageous for purposes of imposing punitive damages). In fact, the defendant's position was rejected that wealth is a necessary prerequisite in *Reading Radio, Inc. v. Fink*, 833 A.2d 199 (Pa.Super.2003). "[T]he jury's assessment of punitive damages is the outrageous conduct of the defendants, not evidence of a

defendant's wealth." *Reading Radio, Inc.*, 833 A.2d at 215 (citing *Shiner v. Moriarty*, 706 A.2d 1228, 1242 (Pa.Super.1998)). "[E]vidence of wealth is not mandatory to establish a claim for punitive damages." Id. (citing *Shiner*, 706 A.2d at 1241). A jury could base its "award of punitive damages entirely on its assessment of [the tortfeasor's] conduct." *Id. See also Viener v. Jacobs*, 834 A.2d 546, 561 (Pa.Super.2003).

Taking from Judge Agresti's Opinion:

The Bankruptcy Code provision dealing with the automatic stay provides in relevant part: an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. §362(k)(1).

With respect to stay violations, punitive damages are awarded in response to particularly egregious conduct, and the purpose of such damages is for both punishment and deterrence. In re Howard, 2011 WL 578777 at *13 (W.D. Pa. 2011) (quoting In re Frankel, 391B.R. 266 (Bankr. M.D. Pa. 2008)). Punitive damages are reserved for cases in which the defendant's conduct was something more than a bare stay violation justifying compensatory damages or injunctive relief. Id. The defendant must have acted with actual knowledge that he was violating the stay, or with reckless disregard of whether he was doing so. Id. Punitive damages are especially appropriate if the defendant has acted in "arrogant defiance" of the Bankruptcy Code. Id.

The decision whether to award punitive damages is left to the sound discretion of the bankruptcy court, and the factors that this Court is to consider in making that determination, including the amount of any such award, are (1) Zokaites' conduct, (2) his motive, (3) whether there was any provocation by the Lansaws, and (4) Zokaites' ability to pay. Id.

The Court is also mindful of the jurisprudence following BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) which makes clear that the imposition of punitive damages raises Constitutional due process concerns such that an award of punitive damages must bear some reasonable relationship to the amount of harm suffered by the plaintiff.

This Court has previously recognized that overreaching by a landlord following bankruptcy filing by the tenant is the sort of conduct that could potentially lead to the imposition of punitive damages. See In re Alvarez, 319 B.R. 108, 111 (Bankr. W.D. Pa. 2004) (citing In re Atlantic Business and Community Corp., 901 F.2d 325 (3d Cir. 1990)).

Zokaites argues that a statement by Judge Fitzgerald stating to Mr. Hulton that Zokaites is subject to punitive damages has been taken out of context. Context is reserved for the trier of facts interpretation.


## Offer of Judgement:

Requiring damages to be paid to the estate or Zokaites is invalid. The Trustee had abandoned all interest in actions against Zokaites and found the Ch. 7 to be a no asset case. The offer in this case was made well after the Plaintiff had incurred multiple fees for the preparation of the complaint, preparing a response to motions to dismiss, and preparing a response to a motion for summary judgment and dozens upon dozens of miscellaneous objections and motions made by Zokaites. In addition, discovery had already taken place over many years generating large legal costs. These costs exceed the total of Zokaites total offer and dramatically exceed the offer related to False Light. Appellee retained attorneys Kirshenbaum, Calaiaro, Hipp, Leon, Boyle and Petro.

*See Eastman v. Baker Recovery Services*, Adv. No. 08-5055-C Bankr. W.D. Tex. Related to expended legal fees. "The offer made was for $5,000, and was filed of record on February 27, 2009. By that point, the Plaintiff had already incurred $3,900 in fees by Alex Katzman (litigation counsel), and $4,150 in fees by Rob Eichelbaum (bankruptcy counsel) by February 27, 2009. Over $9,000 in fees were incurred by Mr. Eichelbaum from late 2007 through the end of 2008. $3,000 in fees was incurred just to convince the Defendants to withdraw the offending judgment -- and that only after the Defendants tried to use that judgment to extract a payment from the Plaintiff. Thus, the judgment,

including the costs incurred to that point in time exceeded the offer in compromise. The Defendants are not entitled to recover their costs from Plaintiff under Rule 68(d)"

Zokaites demands the Offer of Judgment be recognized against his position in the Bankruptcy which has as concluded, by the Trustee, that he has no claim against the assets of the Debtor. There are no assets. The Offer of Judgement specifically offers zero in terms of true value to the Plaintiff. Had the Plaintiff been offered $200,000, the offer would still have been rejected due to Zokaites demand.

Additionally, multiple courts have concluded that when the actual damages are "zero" that Rule 68 does not activate. "There is a line of cases which hold that an Offer of Judgment will not result in cost shifting in a case where the defendant is the prevailing party. *In re LMP Shoal Creek, LLC*, 2007 Bankr. LEXIS 4659 (Bankr. W.D. Tex. 2007); *In re Security Funding, Inc.*, 234 B.R. 398 (Bankr. E.D. Tenn. 1999). Rule 68(d) refers to "the judgment that the offeree finally obtains." These cases hold that if the plaintiff does not recover a judgment that Rule 68 would not apply. This appears to be a strange result, since a damage award of $1 would allow cost shifting, but a take nothing judgment would not."

Additionally, Zokaites arrives with unclean hands:

State law claim for False Light was subject to the grant of non-suit. This is in part due to the inability of Lansaw to continue questioning Zokaites to prove scienter once he perjured himself by stating that he did not erect the sign at the daycare. Once Lansaw realized this would not satisfy the court for this rung of the test for False Light, Lansaw determined that attempting to prove the damages was futile.

From Judge Agresti's Opinion (footnote):

"Zokaites was not asked about this part of the incident by either the Lansaws or his own attorney at the August trial. Even if he had been and denied it, the Court would likely have accepted Mrs. Lansaw's version of events because Zokaites' credibility was seriously undermined in the Court's eyes by his testimony concerning the sign incident from September 2005. Specifically, at the August trial Zokaites denied that he had been the one to place the sign, testifying that it had actually been placed by his brother, John, albeit at Zokaites' direction. 8/4/14 Tr. At 167-68. This seemed to stun the Lansaws, who asked Zokaites a number of challenging questions about it to the point that the Court had to tell them to move on to a new topic. Zokaites' would not retract his testimony, Id. at 210-11, but his denial concerning the sign is contradicted by (1) the Lansaws' testimony, (2) the previous finding by Judge Fitzgerald that Zokaites himself had placed the sign, see December 12, 2006 Opinion at 3-4, and see also the Trial Notes at 39, (3) the statement at the August trial by Zokaites' attorney that "we've already stipulated" that Zokaites placed the sign, 8/4/14 Tr. At p. 57 l. 9-10, and (4) the September 19, 2005 police report on the incident that specifically identifies "Frank Zokaites" as the person observed to be placing the sign when the police officer arrived. **In the face of this overwhelming evidence, the Court can only conclude that Zokaites gave deliberately false testimony on this point, making it proper for the Court to discredit all of his testimony if it so chooses under the principle of falsus in uno, falsus in omnibus**. See, e.g., In re Gisondi, 2014 WL 683755, (E.D. Pa. 3014)."

**Property of the Estate:**

Zokaites repeatedly and without any credible support by case law or Federal Rules of Bankruptcy demanded that any monies that would be due Lansaw for any and all reasons must be directed to Zokaites to satisfy his claim (Zokaites has never adjusted his claim for mitigating lease income, or in relationship to Judge Fitzgerald's conclusion, by footnote, in her opinion, that his lease was extinguished by the signing of the amendment dated June of 2002.

It is clear that the Trustee has determined Lansaw's Chapter 7 Bankruptcy to be "No Asset" and as such the Violation of Automatic Stay damages can be paid to Lansaw without any remuneration to the estate. In this particular case the Trustee was literally

badgered by Lansaw to proceed with the case against Zokaites. The Trustee concluded there would be no value in the case in relation to expenses put forth to collect the damages. The Trustee states that he attempted to find local representation interested in the case on a contingency fee basis and could not find a party to take the case. Lansaw then proceeded pro se.

Also, damages in this case, not unlike an inheritance that occurs in a timely fashion after the filing of a CH 7 as related to its inclusion in the estate, pass to the debtor without approval of or attachment by the Trustee.

Zokaites would attempt to usurp the power of the Trustee in his determination several years ago that there are no assets in this case. The Trustee announced this via PACER and allowed sufficient time for Zokaites to object. Zokaites did not object to the abandonment of interests against him by the Trustee nor did he argue or object to the no asset status of this bankruptcy.

Zokaites also expects this tribunal to disregard testimony as evidence. Zokaites argues a multitude of times that no evidence was provided that would allow Judge Agresti to make correct conclusions of law. Zokaites completely discounts the fact that testimony is evidence. When we enter a court room, the scales of justice are perfectly balanced. In Judge Agresti's court, evidence by a preponderance is the law necessary to swing the balance in either direction. A mere scintilla of evidence is all that need be recognized by the trier of fact. Zokaites argues that Judge Agresti had no evidence and that all testimony presented by Lansaw was untruthful. Yet, Zokaites provides absolutely no evidence to the contrary on any element of the case. Ironically, Zokaites uses the Courts as a weapon of aggression. The Debtors could have paid all Creditors

had Zokaites simply sat back and collected checks. Zokaites stopped that payment potential with his personal vendetta.

Zokaites, on multiple occasions, makes statements to this court that clearly are misrepresentations of fact contained in the trial transcripts. STATEMENTS are of Appellants; FACT, Appellee:

STATEMENT:

"She also admits that she has not told any of her doctors that her depression is from Zokaites."

Fact:

Mrs. Lansaw has stated her depression was related to actions of her Landlord. She did not specifically name Zokaites, but her Landlord is Zokaites. The record does not support Zokaites statement.

Statement:

"Mr. Lansaw testified that he trusts no one, he has no friends other than police officers, he doesn't leave his house, he doesn't travel through Wexford because he is afraid of the police (although he also testified that he has worked at the new day care business, which at all times was within the jurisdiction of the same Northern Regional Police Department whom he claims to fear because he thinks that Zokaites controls the entire

police department), that he wakes up 5-6 times a night, and that he has 2 dogs for protection."

Fact:

Mr. Lansaw does not, to this day, travel through Northern Regional Police Dept. jurisdiction unless absolutely necessary. And he has been advised not to by other Law Enforcement personnel. Issues that were not relevant to the trial have occurred and threat of arrest is a vivid memory. Lansaw has friends who were clients of the daycare who were officers for Northern Regional Police Dept. Lansaw not only cared for their children but two of our employees were adult children of officers of Northern Regional Police Dept. Testimony shows Lansaw never returned to the daycare after the night of the threatened arrest.

Statement:

He stated that the reason why he didn't bring in one medical record or one doctor was because he didn't have to show causation. (Id. at A530). He knew that Dr. Carmen who treated Mrs. Lansaw was not a psychologist but rather a family doctor who works at an Urgent Care.

Fact:

Understanding the egregious nature of Zokaites and Hulton's actions Lansaw concluded that testimonial evidence by both Mr. and Mrs. Lansaw about their personal issues and

what they witness in each other's behavior that would be sufficient evidence. Lansaw never indicated in any testimony that he didn't have to show causation. The trial transcript will also show that Mr. Lansaw did not testify that he knew who treated Mrs. Lansaw or what type of medical doctors they are.

Statement:

Shockingly, he testified that the Northern Regional Police Department are in Zokaites' "back pocket" and that is why he stays out of the Wexford area. (Id. at A552). Equally shocking is his testimony that Lt. Love, a police officer, lied in his report when he said that Mr. Lansaw told him he had a gun on him and if anyone came through the doors he would take action. His testimony is completely contrary to the unequivocal report of Lt. Love and of course, the new day care is also in the heart of Wexford.

Fact:

Northern Regional Police Dept. had multiple opportunities to file charges against Zokaites during his escapades at the daycare. Lt. Love was instructed by ADA Amy Cafardi to investigate him when he threatened Mrs. Lansaw face to face, with chains, to drop the 2005 declaratory judgment action against him. He was on site when Rosemary Smith told of her injury by Zokaites as she tried to enter the daycare while he was chaining the doors. Her testimony before Judge Fitzgerald was that she was bruised and the marks showed even a month later. Judge Agresti found that Lt. Love could have also charged Zokaites with criminal trespass and theft on the night he entered the

daycare, again while the Automatic Stay was in force. This is the night Lansaw was threatened with arrest, his daughter threatened with being turned over to CYS. Lt. Love's report was at best vacant of multiple facts. One, Lansaw was not in possession of a firearm. Mrs. Lansaw was. Lt. Love had to be repeatedly asked to have Zokaites return the keys he stole that were to our home. Lt. Love was told if he came into our home or business in the middle of the night, "I will protect my family." Lt. Love proved repeatedly that he could not be trusted by Lansaw. It should also be noted that during the trial with Judge Fitzgerald, Lt. Love refused to abide by subpoena. He stated he would not testify. Chief Ammons was called by Judge Fitzgerald and after an 11 minute conversation, Judge Fitzgerald had to resort to stating that Federal Marshals would pick up Lt. Love if he did not appear within the hour. History shows Lansaw uses good judgement in avoiding Northern Regional Police Dept.

Statement:

 (d) their failure to seek any medical attention in nine years... and in the next paragraph ...Significantly, they claim that their emotional distress has lasted nine  years and they have not sought any medical help at all for nine years is simply not reasonable nor credible.:

Fact:

The trial is replete with testimony of Mrs. Lansaw's medical treatment. Mr. Lansaw, had been treated in the past by multiple doctors before Zokaites appeared and knew of no medication that he would take that would be of any value as Mr. Lansaw emotions distress was and still is manifesting itself as anger, rejection of other people due to trust

issues and deep resentment of how Zokaites and Hulton has abuse the legal system in order to accomplish their destruction of the Lansaw bankruptcy. Also, one must consider the cost of medical care, even for those who do have insurance. Once in bankruptcy, money is an issue. To penalize a debtor for not being able to get or choose medical help due to financial issues would be penalizing them for their condition. This would also allow a knowledgeable creditor to take advantage of this by acting as he chooses with a significant chance that he would not be held accountable for his actions. And of course in this case, since Hulton has stated under oath that he directed his client to break Federal Law, a knowledgeable attorney could then instruct his client to violate more laws as accountability would be limited.

Being in bankruptcy does not permit the Debtor to simply hire medical experts regardless of their value. Should treating physicians not charge expert fees, they are still in need of compensation. Zokaites worked diligently to see that the Lansaw estate had no monies to support the cost of medical experts. To require medical testimony due to emotional distress because of a Creditors violation of the Automatic Stay is simply inflicting more economic damage on those who are without finances for the necessities of life.

Statement:

Mr. Lansaw was shown Exhibit 18 which was a copy of a disability report that summarized his interview with a counselor. (Apparently he was collecting disability although he worked daily at the day care).

Fact:

Zokaites via Hulton has now accused Lansaw of a Federal Crime. Perpetrating a fraud against the Social Security Administration. The trial transcript will reveal that Lansaw never returned to the daycare after the night of August 26, 2006 when he was threatened with arrest. Lansaw did "work" for the day care as he testified to without pay and not on site. Lansaw never received disability payments from any source, private or Governmental.

Statement:

"The Lansaws testified they did not seek any medical relief including relief from a psychologist for their claimed harm for nine years?

Fact:

The trial transcript contradicts this statement.

The victims of crime suffer emotional distress even up to and after the incarceration of the perpetrator. It is not at all improbable that the memories of Zokaites actions related to the Automatic Stay violation will never be forgotten or ever change the way Lansaw thinks or acts in the future. The degree of apprehension of life may lesson but Lansaw doubts it will ever completely vanish.

Zokaites takes his Plaintiffs as he finds them. Lansaws have a history of close head injury and as such, are not the typical plaintiff. They are more likely to be affected by the behavior of Zokaites, Hulton and their perceived threat from Northern Regional Police officers. Hulton himself, quoted numerous excerpts from Lansaws medical records from the Social Security Administration. He knew via his discovery years ago that he was dealing with fragile Plaintiffs. In hindsight and with some thoughts of Judge Agresti's

perception, it is highly probably that Zokaites and Hulton enjoyed attacking damaged people.

Statement:

Zokaites' first observation which was noted above is that Garth Lansaw testified that he didn't need to show evidence of causation.


Fact:

There is no testimony where Lansaw states that he did not have to show evidence of causation. In fact it should be presumed by default that if Zokaites and Hulton violated the Automatic Stay, the meeting of causation has been met. The testimony 9 years after the events is as fresh as it was only 60 days after the violations of the Automatic Stay. Lansaws have lived this testimony. They relive the events regularly.

Statement:

Importantly, in an email from Calaiaro to Mr. Lansaw, Calaiaro outright tells Mr. Lansaw that he has lied about any Menchyk loss and has lied about any loss of business income.


Fact:

Calaiaro testified under oath during his defense of his fees held by Judge Fitzgerald. (The entire transcript is available.) His testimony, when it suited his work for fees, was that there was, by his office, a calculation of the losses due to the removal of Menchyk

children. When Calaiaro called Menchyk to testify, he was rejected. This was expected by Lansaw. Menchyk was a former counsel to Lansaw against Zokaites and as such she learned of all of his present and prior behavioral antics. She learned that her infant son was sitting in the infant room at the time Zokaites swung heavy contractor's chains and tossed them towards that window. It is not unbelievable that Menchyk would want as much distance between her family and Zokaites. She moved her children nearly 40 miles from her home for child care after she left Lansaws care. Menchyk lives approximately 2 miles from Zokaites.

Statement:

Zokaites states "the Court cannot factually distinguish whether the emotional distress was caused by their failing business"


Fact:

The business was not failing before the involvement of Zokaites and with the aid of Hulton from 2002 to 2011. Mrs. Lansaw never regained her capabilities of properly managing the daycare and Mr. Lansaw would not enter the daycare space due to the threat of arrest believed to be potentially engineered by Zokaites.

Statement:

"It is not unreasonable to assume that the Lansaws experienced some distress for a period of time such as a week."

Fact:

Zokaites wants to be the party that decides how long a period of time is. It is not his choice. The choice of credibility remains solely with Judge Agresti. Judge Agresti did not invalidate Lansaws testimony but took it in correct context and applied a reasonable ratio to his determination of damages. Lansaw does not argue this method. It is clearly within reason.

Zokaites suggests that if Judge Agresti had flexibility in his decision process related to the amount of damages awards, all damages should be rejected. No matter how thinly you slice the pie, Zokaites is responsible for many, many slices.

Appellee is content that Judge Agresti exercised appropriate discretionary power.

J-A05013-15 PA Super 165

COMMONWEALTH OF PENNSYLVANIA IN THE SUPERIOR COURT OF PENNSYLVANIA

Appellant v. FARUQ ROBINSON   Appellee No. 1305 EDA 2014

The term "discretion" imparts the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, and discretionary power can only exist within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judges. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary action. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

Shaffer, supra at 626, 712 A.2d at 751 (citation omitted).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing

## Response Brief for the Appellees

Was served upon the Defendants by 1st Class US Mail this 11th day of September, 2015

Appellant: Frank Zokaites

By way of:

Jeffrey A. Hulton, Esquire

1201 Law and Finance Building

429 Fourth Avenue

Pittsburgh, Pa. 15219

Garth F. Lansaw

Deborah L. Lansaw

Plaintiff/Debtor

2353 Fairhill Road

Sewickley, PA. 15143

412-992-8133